**2015-1485**

IN THE

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

RESPIRONICS, INC.,

*Appellant,*

v.

ZOLL MEDICAL CORPORATION,

*Appellee.*

**Appeal from the United States Patent and Trademark Office
Patent Trial and Appeal Board**

**BRIEF OF APPELLANT
RESPIRONICS, INC.**

DENISE W. DEFRANCO
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
Two Seaport Lane, 6th Floor
Boston, MA  02210
(617) 646-1600

JASON L. ROMRELL
CLARA N. JIMENEZ
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC  20001-4413
(202) 408-4000

May 26, 2015                    *Attorneys for Appellant*

## CERTIFICATE OF INTEREST

Counsel for Appellant Respironics, Inc., certify the following:

1.     The full name of every party or amicus represented by me is:

Respironics, Inc.

2.     The name of the real party in interest represented by me is:

Respironics, Inc., and Koninklijke Philips N.V. are identified as real parties in interest.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

Respironics, Inc., is a wholly owned subsidiary of Koninklijke Philips N.V.

4.     The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this Court are:

J. Michael Jakes
Denise W. DeFranco
Jason L. Romrell
Clara N. Jimenez
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, LLP

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ....................................................................i

TABLE OF AUTHORITIES ......................................................................iv

STATEMENT OF RELATED CASES ........................................................vi

STATEMENT OF JURISDICTION.............................................................1

I.     STATEMENT OF THE ISSUE .........................................................1

II.    STATEMENT OF THE CASE ..........................................................2

     A.    Preliminary Statement ..........................................................2

     B.    Nature of the Case, Course of Proceedings, and Disposition
         Below................................................................................4

III.   STATEMENT OF FACTS ...............................................................5

     A.    The '003 Patent ...................................................................5

     B.    The Prior Art: Owen.............................................................7

     C.    The Proceedings Below.......................................................10

IV.   SUMMARY OF ARGUMENT .......................................................16

V.    ARGUMENT..................................................................................18

     A.    Standard of Review ............................................................18

     B.    The Board Applied an Improperly Narrow Construction of
         "Patient Compliance Data" .................................................19

         1.    Under the correct claim construction, Owen's
              response button provides "patient compliance data"...............20

         2.    Under the correct claim construction, Owen's wear-
              time indicator provides "patient compliance data"..................25

     C.    Owen Anticipates the '003 Patent Even Under the Board's
         Improperly Narrow Claim Construction .............................30

1.     Owen discloses recording and analyzing both the time at which a verbal prompt is given and the time at which the patient responds..........................................................31

2.     Owen discloses a training protocol that records how fast a patient is responding to verbal prompts ..........................33

D.     Owen Also Discloses the Remaining Elements of the Challenged Claims ...............................................................................34

VI.     CONCLUSION..........................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Abbott Diabetes Care Inc.*,
   696 F.3d 1142 (Fed. Cir. 2012) ............................................................ 19, 21, 22

*In re Baker Hughes, Inc.*,
   215 F.3d 1297 (Fed. Cir. 2000) ........................................................................ 19

*Blackboard, Inc. v. Desire2Learn, Inc.*,
   574 F.3d 1371 (Fed. Cir. 2009) ........................................................................ 30

*In re Cuozzo Speed Techs., LLC*,
   778 F.3d 1271 (Fed. Cir. 2015) ................................................................... 18, 19

*Hazani v. U.S. Int'l Trade Comm'n*,
   126 F.3d 1473 (Fed. Cir. 1997) ........................................................................ 25

*Hewlett-Packard Co. v. Mustek Sys., Inc.*,
   340 F.3d 1314 (Fed. Cir. 2003) ................................................................... 24, 27

*In re ICON Health & Fitness, Inc.*,
   496 F.3d 1374 (Fed. Cir. 2007) ........................................................................ 19

*Intervet Inc. v. Merial Ltd.*,
   617 F.3d 1282 (Fed. Cir. 2010) ........................................................................ 22

*In re NTP, Inc.*,
   654 F.3d 1268 (Fed. Cir. 2011) ........................................................................ 19

*Orion IP, LLC v. Hyundai Motor Am.*,
   605 F.3d 967 (Fed. Cir. 2010) ......................................................................... 27

*SiRF Technology, Inc. v. International Trade Commission*,
   601 F.3d 1319 (2010) ................................................................................. 27, 28

*Storage Tech. Corp. v. Cisco Sys., Inc.*,
   329 F.3d 823 (Fed. Cir. 2003) ......................................................................... 22

iv

*In re Suitco Surface, Inc.*,
    603 F.3d 1255 (Fed. Cir. 2010) .......................................................17, 19, 31, 33

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*,
    —U.S.—, 135 S. Ct. 831 (2015)...................................................................18

*Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.*,
    412 F.3d 1319 (Fed. Cir. 2005) .......................................................................25

*Zoll Med. Corp. v. Respironics, Inc.*,
    No. 12-cv-1778-LPS (D. Del.) .........................................................................10

## Federal Statutes

28 U.S.C. § 1295(a)(4)(A) ........................................................................................1

35 U.S.C. § 6 ............................................................................................................1

35 U.S.C. § 102(b) ...................................................................................................7

35 U.S.C. § 141(c) ...................................................................................................1

35 U.S.C. § 318(a) ...................................................................................................1

## Regulations

37 C.F.R. § 42.73 .....................................................................................................1

37 C.F.R. § 42.100(b) .............................................................................................18

**STATEMENT OF RELATED CASES**

There has been no other appeal from the present action in this or any other appellate court.  This Court's decision in the pending appeal will likely affect the pending district court litigation, *Zoll Medical Corp. v. Respironics, Inc.*, No. 12-cv-1778-LPS (D. Del.), which was stayed pending this *inter partes* review.

## STATEMENT OF JURISDICTION

The U.S. Patent and Trademark Office's Patent Trial and Appeal Board ("PTAB" or "Board") had jurisdiction over this *inter partes* review proceeding under 35 U.S.C. § 6. The Board entered its Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 on September 17, 2014. Respironics, Inc. ("Respironics"), filed a Request for Rehearing on October 17, 2014. The Board entered its decision on the Request for Rehearing on January 2, 2015. Respironics filed a timely notice of appeal on February 9, 2015. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## I.    STATEMENT OF THE ISSUE

1.   Whether the Board erred as a matter of law by applying its claim construction too narrowly in concluding that claims 2, 4, 5, 8, 9, 16, 19, and 20 of U.S. Patent No. 6,681,003 ("the '003 patent") are not anticipated by the Owen reference.

2.   Whether even under the Board's narrow claim construction, the Board's determination of no anticipation is supported by substantial evidence where the Owen reference explicitly teaches the very limitation—recording the time at which an instruction is given to a patient—that the Board found lacking with respect to Owen's response button.

## II.    STATEMENT OF THE CASE

### A.    Preliminary Statement

The '003 patent is directed to methods and systems to monitor, store, and transmit various types of data from wearable medical devices to central locations—typically a hospital or a doctor's office—where the data can be used to assess the patient's condition and response to treatment or to check that the medical device is working properly.  The types of data monitored, stored, and transmitted include data related to the symptoms exhibited by the patient, data related to the medical device, and, of particular importance to this case, data related to the patient's compliance with the prescribed treatment.

But the methods and systems of the '003 patent are not novel.  As acknowledged by the patentee, the wearable medical device described in the patent—a wearable cardiac defibrillator—was well known in the prior art.  Even more, the technology used to transmit data to and from the patient's location to a remote location was also well known in the art.  Indeed, International Patent Publication No. WO 98/39061 to Owen et al. ("Owen") describes systems and methods just like the ones described and claimed in the '003 patent.  Owen discloses systems and methods for treating a patient using a wearable defibrillator. The system monitors the patient for a predetermined condition via one or more electrodes on the defibrillator, defibrillates the patient if needed, and stores the

monitored data in a memory on the defibrillator. Like the '003 patent, Owen monitors and stores various types of data, including data related to the patient's condition, demographic data about the patient, information about the patient's training on the use of the defibrillator, data related to how the patient interacts with the defibrillator, including data related to the patient's compliance with the prescribed treatment, and data related to the functioning of the defibrillator itself. Owen also discloses transmitting the information stored in the defibrillator's memory to an external location.

In spite of Owen's clear disclosure of the same methods and systems claimed in the '003 patent, the Board concluded that Owen does not anticipate the disputed claims because it allegedly fails to disclose "patient compliance data." But Owen does disclose patient compliance data, which the Board construed to mean "data indicating whether a patient has followed instructions for use." While that construction is ostensibly correct, the Board still erred for two reasons. First, the Board misapplied its own claim construction by requiring Owen to disclose more than just "data indicating whether a patient has followed instructions for use." Second, even assuming that the Board's construction—as applied—is correct, the Board overlooked disclosures in Owen that teach the very limitation the Board found missing with respect to Owen's response button, thereby satisfying the "patient compliance data" limitation under the Board's morphed

3

construction too. For these reasons, the Board's decision that Owen fails to anticipate claims 2, 4, 5, 8, 9, 16, 19, and 20 of the '003 patent should be reversed. At a minimum, the case should be remanded to the Board with instructions to reassess Owen based on a correct application of its construction of the term "patient compliance data."

## B. Nature of the Case, Course of Proceedings, and Disposition Below

Respironics filed a petition challenging the patentability of claims 1, 2, 4, 5, 8, 9, 16, 19, and 20 of the '003 patent as anticipated. A795, A808-20. The Board instituted *inter partes* review of all the challenged claims, finding that Respironics had established a reasonable likelihood that each of these claims was unpatentable as anticipated by Owen. A950-51. In its Final Written Decision, however, the Board held that, while Respironics established that Owen anticipates claim 1[1] (A12), Respironics failed to prove by a preponderance of the evidence that the remaining claims (i.e., claims 2, 4, 5, 8, 9, 16, 19, and 20) are unpatentable as anticipated by Owen. A12-20. In particular, the Board held in its Final Written Decision that "Respironics has not shown that Owen discloses 'patient compliance

---

[1] Zoll did not appeal the Board's determination that claim 1 is unpatentable. Thus, claim 1 is not at issue in this appeal.

data' as [the Board has] construed that term."[2]    A18.    Respironics timely filed a

Request for Rehearing (A1371-88), which the Board denied (A30-36).  This appeal

to the Federal Circuit followed.  A1389-94.

## III.    STATEMENT OF FACTS

### A.    The '003 Patent

The '003 patent discloses methods for monitoring patient medical

information for the treatment of a patient, and systems for monitoring patient

medical information and providing treatment to a patient using wearable medical

devices known in the prior art.  A44 at 2:46-3:14.  In particular, the claims at issue

in this appeal are directed to monitoring and storing different types of patient and

device data by the wearable device, and the subsequent transmission or exchange

of the stored data to a central location.  Types of data collected and transmitted

include, e.g., patient medical information, device performance data, and patient

compliance data.

At the center of the Board's decision, and this appeal, are the limitations

reciting "patient compliance data" and "patient compliance and use data."

Independent claims 2 and 4 are exemplary:

---

[2] Independent claims 2 and 19 recite "patient compliance data," while independent claim 4 recites "patient compliance and use data."  The Board and the parties agreed that both terms share the same construction.  A945-46.  Thus, as used herein, the term "patient compliance data" refers to both terms.

2.  A method of monitoring patient medical information for the treatment of a patient, the method comprising the steps of:

providing a wearable medical device for treating the patient and monitoring patient medical information;

operatively connecting the medical device to the patient such that the medical device is worn by the patient;

recording the patient medical information, device performance data and *patient compliance data* in a storage means of the medical device;

operatively connecting the medical device to a communications system;

transmitting the patient medical information, device performance data and *patient compliance data* to a health care provider by means of said communications system and recording the patient medical information, device performance data and *patient compliance data* in an information database, wherein said transmitting step is performed while the medical device is operatively connected to the patient for providing treatment to the patient; and

providing access to the patient medical information, device performance data and *patient compliance data* to individuals.

A48 at 10:25-48 (emphases added).

4. A system for monitoring patient medical information and providing treatment to a patient, the system comprising:

a wearable medical device for monitoring and storing medical parameters and treating the patient in response to a monitored medical condition, the medical device operatively attachable to the patient such that the medical device is worn by the patient;

a communications network;

means for connecting the medical device to the communication network;

a patient database;

means for monitoring and storing operations information of the medical device and *patient compliance and use data*;

means for connecting the patient database to the communication network; and

means for exchanging information between the medical device and the patient database, including means for transmitting the medical device operations information and the *patient compliance and use data* to the patient database via the communication network.

A48 at 10:54–A49 at 11:7 (emphases added).[3]

## B.    The Prior Art: Owen[4]

Like the '003 patent, Owen discloses a wearable defibrillator capable of monitoring a patient's heart condition and administering a defibrillating shock if needed. A1442:16-32; A1536-37. The defibrillator monitors and stores a variety of patient-related and device-related information in the data logging memory block. *See* A1475:9-32. In particular, the defibrillator has a data logging memory block that stores the operational history of the defibrillator and information relating

---

[3] *See supra* n. 2.

[4] Owen was published on September 11, 1998, and qualifies as prior art to the '003 patent under pre-AIA 35 U.S.C. § 102(b) (2006).

to the patient.  A1475:9-10.  Stored information includes, for example, execution time measurements determining whether the defibrillator operated as expected (A1475:21-22); instructions on how to use the defibrillator (A1475:31); and patient parameters (A1475:31-32).  Those patient parameters further include, for example, the language used for voice and corresponding text messages; a minimum audio level to which a patient responds; a minimum tactile stimulation signal to which a patient responds; a time and a date at which the defibrillator was issued to the patient; and an electrode-to-skin impedance range, which is used to determine whether the electrodes are not attached, or are improperly attached, to the patient. A1476:1-17.

The defibrillator also stores information concerning the patient interaction with the defibrillator.  A1475:17-19.  For instance, Owen's defibrillator uses a response button feature that prevents delivery of a defibrillating shock to a conscious patient.  A1473:13-15.  In operation, the patient pushes the response button in response to a verbal message issued by the defibrillator—for example, "PLEASE RESPOND"—to confirm the patient's consciousness.  A1473:11-15; *see also* A1489:11-25.  Owen's defibrillator may also include another button for the patient to record a cardiac event.  A1473:15-19.  In certain embodiments, these two functions may be combined into a single button that the patient may push in response to an instruction and/or to record a cardiac event.  *See* A1473:15-24.

In preferred embodiments, the defibrillator trains patients in the use of the response button via a response training protocol. A1490:28-30. The training protocol determines and records whether and how fast the patient has responded to an alert (i.e., when the patient must respond to a message from the defibrillator). A1491:1-22. The training protocol develops a habitual reaction in the patient to push a button in response to voice and tactile simulation prompts—the same prompts that the patient would receive during a potential rescue situation. A1491:8-11. Indeed, the training protocol "regularly expose[s]" the patient to the "PLEASE RESPOND" voice message prompt and, if the patient does not respond to the first prompt, the device delivers a second voice prompt and a tactile stimulation signal. A1491:1-22. And each time the test is performed, the training protocol indirectly shows the patient that, before electrical therapy will be applied, the patient will be exposed to a series of voice and tactile stimulation signals prompts to confirm that the patient is unconscious. *Id*. An indication that the patient has been trained in the use of the wearable defibrillator is also stored in the data logging memory block. A1475:10-14.

Owen also teaches a visual indicator on the defibrillator that may display a message indicating that "the patient has been wearing electrode harness 4 for greater than a recommended period of time." A1471:24-32. Displayed messages, such as this, are also stored in the data logging memory block. A1475:10-17.

The data logging memory block essentially stores any information provided to, or transmitted from, the defibrillator over a predetermined time. A1476:18-20. The data is stored in a log format and includes time data specifying the time at which each event stored in the memory occurred. A1476:18-22. The information collected in the data logging memory is transmitted to an external location, such as a hospital or a doctor's office. *See, e.g.*, A1439 at Abstract; A1492:24-1493:8; A1504:2-13; A1505:16-18; A1517:17-A1518:4.

## C.     The Proceedings Below

In December 2013, ZOLL Medical Corporation ("Zoll") filed a lawsuit accusing certain Respironics sleep apnea devices and their data transmission platform EncoreAnywhere™ of infringing the '003 patent.[5]  In response, Respironics filed a petition for *inter partes* review, asserting *inter alia* that four prior art references anticipated claims 1, 2, 4, 5, 8, 9, 16, 19, and 20 of the '003 patent. A943. The Board instituted *inter partes* review of all the challenged claims, finding that Respironics had established a reasonable likelihood that Owen anticipates all the challenged claims. A950. Upon institution, the district court stayed the litigation.

---

[5] All the claims challenged during the *inter partes* review, except for claim 9, are asserted against Respironics in the district court litigation. *Zoll Med. Corp. v. Respironics, Inc.*, No. 12-cv-1778-LPS (D. Del.).

10

In its Institution Decision, the Board construed the term "patent compliance data" to mean "data indicating whether a patient has followed instructions for use." A946. In an "Overview of Owen," the Board noted that Owen's wearable defibrillator "includes a response button, which the user can push in response to an instruction from the device to respond." A947. The Board further noted that the "defibrillator includes data memory logging block 57 that stores all information provided to, or transmitted from, the defibrillator, including both operational and patient information," including "if and when the patient has pressed the response button." *Id.* Agreeing with Respironics, the Board concluded that "on the [then] present record, . . . Owen does disclose such patient compliance data; data logging memory block 57 stores information indicating whether the patient pressed a button in response to an instruction to do so." A948-49. The Board also found that Owen discloses that the information monitored and stored by Owen is transmitted over a communications interface to a remote location. A949.

In its Final Written Decision, the Board found that Respironics established by a preponderance of the evidence that Owen anticipates claim 1. Claim 1 recites:

> 1. A method of monitoring patient medical information for the treatment of a patient, the method comprising the steps of:
>
> providing a wearable medical device for monitoring patient medical information and treating the patient in response to a monitored medical condition;

operatively connecting the medical device to the patient such that the medical device is worn by the patient;

recording the patient medical information in a storage means of the medical device;

operatively connecting the medical device to a communications system;

transmitting the patient medical information to a health care provider by means of said communications system and recording the patient medical information in an information database; and

providing access to the patient medical information to individuals.

A48 at 10:6-24.

The Board also addressed Zoll's argument that the term "patient compliance data" should be construed as "data quantifying an extent to which a patient correctly follows instruction."  A7.  The Board rejected that argument, stating "although Zoll shows that patient compliance data *may* be quantitative, Zoll does not explain why patient compliance data *must* be quantitative."  A7-A8.  Accordingly, the Board stated:  "[w]e maintain our initial determination that the terms are properly construed to mean 'data indicating whether a patient has followed instructions for use.'"  A8.

With respect to the remaining challenged claims, the Board determined that Respironics failed to establish by a preponderance of the evidence that Owen anticipates claims 2, 4, 5, 8, 9, 16, 19, and 20.  Even though the Board's Final

Written Decision purportedly applied the same claim construction as in its Institution Decision, the Board reversed course, holding that Owen's disclosure of data related to the response button no longer met the "patient compliance data" limitation recited in the claims. *See* A16.

Addressing Owen's disclosure of "a response button, which the user can push in response to an instruction from the device to respond" (A9-10), the Board held that "[b]utton-push information recorded in [Owen's] memory block is not usable as patient compliance data, because there is no way to know that it indicates whether the patient followed instructions." A16. The Board relied on Owen's alleged failure to disclose sufficient context to distinguish a prompted button push from a hypothetical unprompted or accidental button push. A16. And in the absence of an "assurance" as to whether a particular button push was in response to an instruction or unprompted, the Board held that data related to pressing the response button does not indicate whether the patient followed instructions for use. A16.

Addressing Owen's wear-time indicator, the Board rejected Respironics's argument that Owen's disclosure of visual messages informing the patient that he or she had worn the device "for greater than a recommended period of time" is also "data indicating whether a patient has followed instructions for use." A9, A16-17. The Board believed that, "[w]ithout evidence that [the] patient had been told not to

wear the harness longer than a recommended period of time, information that the patient exceeded this time cannot be said to indicate whether the patient followed instructions for use." A17.

Respironics filed a Request for Rehearing urging the Board to reconsider its Final Written Decision. A1371. Respironics argued that the Board's conclusion that data related to the response-button push is not "patient compliance data" because there are multiple reasons why a patient may push the response button—besides in response to an instruction to do so—was wrong as a matter of law. A1381-82. Respironics noted that a reference may anticipate if one of its embodiments discloses all the elements of a claim even though it may also disclose other non-anticipating embodiments. A1383.

Respironics also argued that the Board did not faithfully apply its original construction of the term "patient compliance data." With respect to Owen's wear-time indicator, Respironics argued that Owen's disclosure of a message telling the patient that he or she has worn the defibrillator for an amount of time "greater than the recommended period of time" meets the "patient compliance data" limitation, and the Board improperly required Owen to explicitly disclose that the patient had been told not to wear the defibrillator for longer than the recommended time, when this is not required by the Board's original claim construction. A1377-78. Respironics noted that the Board's original claim construction requires "data

indicating *whether* a patient has followed instructions for use . . . not data indicating '*what* the recommended wear time is.'" A1375-76.

The Board denied Respironics's Request for Rehearing. A34. In addressing Respironics's arguments related to Owen's response button, the Board concluded:

> Respironics did not identify any credible disclosure in Owen indicating that its data record of a button push reflects whether the push was prompted. Because Owen does not disclose recording, e.g., *the time at which the user was prompted*, the information that it does record about button pushes is *insufficient* to distinguish prompted pushes from unprompted or accidental ones.

A33 (emphases added) (citation omitted). Finally, the Board concluded that Respironics had not identified "any Owen embodiment in which the data Owen records is sufficient to indicate that a button push was prompted." A33-34.

As for Owen's disclosure of a wear-time indicator (i.e., data indicating that the "patient has been wearing the electrode harness 4 greater than the recommended period of time"), the Board concluded that Respironics did not identify where Owen discloses that "it is *the patient* who is told what the recommended wear time is." A32. According to the Board, "[a] patient cannot be said to have failed to comply with a recommendation absent evidence that the patient received the recommendation." A32. Thus, the Board determined that "Owen's statement that the patient exceeded this time cannot be deemed to indicate noncompliance." A32.

15

## IV.    SUMMARY OF ARGUMENT

The Board's decision should be reversed for at least two reasons.  First, the Board misapplied its own claim construction of "patient compliance data," analyzing Owen under an improperly narrow interpretation of the claim language.  Second, the Board's decision should be reversed because it is not supported by substantial evidence.  Even under the Board's erroneous application of its original construction, Owen discloses each limitation of the challenged claims.

Neither the claims nor the Board's original construction of "patient compliance data" require an instruction to be provided at a particular time, or prohibit a patient response in the absence of an instruction.  Rather, the Board's original construction requires only "data *indicating whether* a patient has followed instructions for use."  A7 (emphasis added).  Nevertheless, the Board determined that Owen's response-button disclosure did not meet the "patient compliance data" limitation because Owen failed to provide sufficient context to determine whether the patient's pushing the response button was in response to an instruction or accidental.  It is undisputed that, in its preferred embodiment, Owen explicitly teaches that "the response button is pushed in response to, e.g., a 'PLEASE RESPOND' verbal message so as to confirm patient consciousness or lack thereof."  A1473:11-15.  The Board acknowledged that this was sufficient to meet the limitation in its Institution Decision, noting that Owen discloses a defibrillator

that "includes a response button, which the user can push *in response to an instruction* from the device to respond." A9-10.

Under the Board's original construction of "patient compliance data," the patient's receipt of an instruction is not required to satisfy the limitation. The delivery of an instruction is not claimed. Thus, the Board also erred when it determined that Owen's wear-time data did not meet the "patient compliance data" limitation. Owen's defibrillator provides the patient with a visual message indicating that the "patient has been wearing electrode harness 4 for greater than a recommended period of time." A1471:24-32. By requiring Owen to explicitly disclose that the patient had been told what the recommended wear time is, the Board inappropriately imported a new limitation into the claim, rendering its ultimate conclusion on anticipation erroneous as a matter of law.

In the alternative, this Court should reverse the Board's decision because even under the Board's incorrect application of its claim construction, its conclusion that Owen does not anticipate the challenged claims of the '003 patent is not supported by substantial evidence. *See In re Suitco Surface, Inc.*, 603 F.3d 1255, 1259-61 (Fed. Cir. 2010). With respect to its response-button, Owen *does* disclose recording the time at which the verbal prompt is given to the patient. Specifically, Owen teaches that data is preferably stored in its memory data logging block in a format that includes "*time data specifying a time at which each*

17

*event occurred*." A1476:18-24 (emphasis added). "[V]oice, tone, and buzzer prompts," and "information concerning patient interaction with the defibrillator 10 (e.g., if and when the patient has pressed the response button)" are precisely two of the types of data stored in the data logging memory block. A1475:17-19. Moreover, Owen also discloses a training protocol for the response button during which the defibrillator monitors *how fast* the patient responds after hearing the voice prompt. *See* A1491:19-20. Because Owen clearly teaches—in at least two different contexts—recording both the time that an instruction is given and the time that the patient follows that instruction, the Board's ultimate finding of no anticipation is not supported by substantial evidence and should be reversed.

## V.    ARGUMENT

### A.    Standard of Review

During *inter partes* review, the Board must give claims their broadest reasonable construction consistent with the specification. 37 C.F.R. § 42.100(b). This Court reviews the Board's claim construction according to the Supreme Court's decision in *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, —U.S.—, 135 S. Ct. 831, 841 (2015). *See In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271, 1282-83 (Fed. Cir. 2015) (applying *Teva* in an appeal from *inter partes* review). Under *Teva*, underlying factual determinations concerning extrinsic evidence are reviewed for substantial evidence, and the Board's ultimate construction of the

claim is reviewed de novo. *Id.*; *see also In re NTP, Inc.*, 654 F.3d 1268, 1274 (Fed. Cir. 2011) (citing *In re Baker Hughes, Inc.*, 215 F.3d 1297, 1301 (Fed. Cir. 2000)). In this case, the Board's claim construction did not rely on extrinsic evidence. Thus, this Court reviews the Board's claim construction de novo to determine whether, as a matter of law, the Board applied the "broadest reasonable construction consistent with the specification." *See In re Suitco*, 603 F.3d at 1259 (quoting *In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1379 (Fed. Cir. 2007)).

Although anticipation itself is a question of fact, reviewed for substantial evidence on appeal, this Court has vacated anticipation decisions when the Board's "broadest reasonable construction" was unreasonable, overly broad, or inconsistent with the patent's claim language or the specification. *Id.* at 1259-61. This Court has also rejected anticipation decisions where the "Board's original construction is reasonable in view of the specification," but the Board's application of that construction creates a new "modified construction" that is no longer correct. *See In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1151 (Fed. Cir. 2012).

## B. The Board Applied an Improperly Narrow Construction of "Patient Compliance Data"

In its Final Written Decision, the Board concluded that claims 2, 4, 5, 8, 9, 16, 19, and 20 are not anticipated because Respironics failed to prove that Owen disclosed "patient compliance data." A18. In relevant part, the challenged claims

recite monitoring, storing, and transmitting "patient compliance data," which the Board construed as "data indicating whether a patient has followed instructions for use." A946. While Respironics does not challenge the Board's original construction of "patient compliance data," the Board misapplied this construction to Owen when it added limitations not supported by the claim language or the specification of the '003 patent. Because the Board applied its claim construction too narrowly, this Court should reverse the Board's conclusion that Owen fails to anticipate the challenged claims.

### 1.    Under the correct claim construction, Owen's response button provides "patient compliance data"

As an initial matter, the Board erred when it found that "information indicating whether and when the patient pushed the response button does not constitute 'patient compliance data'" because "Respironics does not identify disclosure that Owen records *the time at which the verbal prompt is given to the patient*." A16 (emphasis added). According to the Board, without this context, the information recorded upon pushing a button is insufficient to distinguish a prompted button push from an unprompted button push or an accidental one, so there is no assurance that the button push was performed in response to an instruction. A16.

With respect to Owen's response button, the Board misapplied its own claim construction in at least two ways. First, the Board faulted Respironics for not

20

identifying a "disclosure that Owen records the time at which the verbal prompt is given to the patient." A16. But recording the time at which an instruction is given is not part of the disputed claims. The Board's original construction of "patient compliance data" as "data indicating whether a patient has followed instructions for use" has no time-recording requirement.

Second and related to the first error, the Board held that because there "is no *assurance* that every, or indeed *any*, recorded button push was performed in response to an instruction," Owen does not disclose "patient compliance data." A16 (first emphasis added). And again, in its decision denying rehearing, the Board concluded that Owen's recorded data "is insufficient to distinguish prompted pushes from unprompted or accidental ones." A33. This too was an erroneously imported limitation. Neither the claims nor the specification require any *assurance* that a particular piece of data was produced in response to an instruction. To the contrary, the Board's original construction used the term "indicating," not "assuring." A8.

Although the Board did not formally announce these changes to its original claim construction, it erroneously inserted extraneous limitations when applying that construction. The Board made a similar mistake in *In re Abbott Diabetes Care*, 696 F.3d at 1150-51. There, the Board construed the term "substantially fixed" to allow for "some movement of the [claimed] sensor relative to the position

21

of the sensor control unit." *Id.* But when the Board applied that construction to the prior art, it determined that a sensor that was only "somewhat restrained" would satisfy the "substantially fixed" limitation. *Id.* at 1151. This Court disagreed, holding instead that a sensor that was only "somewhat restrained" allowed for too much movement. *Id.* Accordingly, this Court vacated the Board's decision and remanded with instruction to "apply its original construction of 'substantially fixed.'" *Id.*; *see also Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1287, 1290 (Fed. Cir. 2010) (applying a de novo standard of review in holding that the district court improperly applied its claim construction); *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 834 (Fed. Cir. 2003) (holding that, although the district court's original claim construction was correct, it misapplied that construction in deciding summary judgment by improperly importing an additional element).

Like it did with "substantially fixed" in *Abbott*, the Board here also misapplied its original construction of "patient compliance data." Neither the claims nor the Board's original construction of "patient compliance data" require recording the time at which an instruction is provided to a patient, or prohibit a patient response in the absence of an instruction. Rather, the Board's original construction requires only "data *indicating whether* a patient has followed instructions for use." A7 (emphasis added).

Owen's preferred embodiment meets the Board's original, correct construction. It is undisputed that, in the preferred embodiments of Owen, "the response button is pushed in response to, e.g., a 'PLEASE RESPOND' verbal message so as to confirm patient consciousness or lack thereof." A1473:11-15. Zoll's expert, Charles Gropper, acknowledged the same. A2566-67. It is also undisputed that the data logging memory block stores "information concerning patient interaction with the defibrillator 10 (e.g., if and when the patient has pressed the response button)." A1475:17-19. Together, the defibrillator's verbal messages and the patient's push-button responses are analyzed "so as to confirm patient consciousness or lack thereof." A1473:13-15. Put another way, pushing the response button indicates whether the patient has followed Owen's "PLEASE RESPOND" instruction, and thus whether the patient is conscious.

That this disclosure satisfies the Board's original construction of the term "patient compliance data" is clear from the Board's own findings. A9-10 (finding that Owen discloses a defibrillator which "includes a response button, which the user can push *in response to an instruction* from the device to respond" (emphasis added)). There is no basis for the Board's newly minted requirement that Owen disclose the temporal context of a patient's response. In effect, the Board required an assurance from Owen that a particular button push is in response to a particular instruction. But the Board rejected Zoll's similar argument "that the broadest

reasonable construction [of 'patient compliance data'] should be constrained to require that the data quantify the extent to which a patient correctly follows instructions" as inconsistent with "how the term would be understood by one of ordinary skill in the art" and "how the term is used in the '003 patent." A7. The Board was right the first time. This Court should reject the Board's later importation of erroneous claim limitations.

Under the Board's original construction, it does not matter that a patient might push the response button in the absence of verbal instructions. The relevant fact is that, as the Board found, Owen discloses that "a user can push [the response button] in response to an instruction from the device to respond." A9-10. *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1326 (Fed. Cir. 2003), is analogous. In that case, the patentee argued that a prior-art scanner did not anticipate the claimed step of "perform[ing] a final scan of a portion of the picture which *corresponds* to the portion of the preview scan image to produce a final scan image." The patentee did not dispute that the prior-art scanner could produce the claimed correspondence. *Id.* Nevertheless, the patentee asserted that because the prior-art scanner did not *always* produce the claimed correspondence, the prior-art scanner did not anticipate. *Id.* This Court rejected the patentee's argument, holding instead that "a prior art product that sometimes, but not always, embodies a clamed method nonetheless teaches that aspect of the invention." *Id.*; *see also*

24

*Hazani v. U.S. Int'l Trade Comm'n*, 126 F.3d 1473, 1477-78 (Fed. Cir. 1997) (finding anticipation even though the capacitor in the prior art did not store charge in every mode of operation because, in certain modes, the capacitor did store charge); *Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir. 2005) (affirming a finding of anticipation where the prior art disclosed that antioxidants can be "optionally include[d]" even though the asserted claim "*expressly excludes* antioxidants").

The presence of alternative uses of the Owen's response button does not negate the fact that, in at least some instances, the button is pushed in response to an instruction, thereby satisfying the "patient compliance data" limitation. As discussed above, there is no "assurance" requirement in the claims. What matters is that, in at least one embodiment in Owen, the response button *is* pushed "in response to an instruction," thereby indicating whether the patient has followed that instruction. A9-10. For this reason alone, the Board's decision is incorrect.

### 2. Under the correct claim construction, Owen's wear-time indicator provides "patient compliance data"

The Board also erred when it determined that Owen's disclosure of a wear-time indicator did not meet the "patient compliance data" limitation.

Owen's defibrillator provides the patient with a visual message indicating that the "patient has been wearing electrode harness 4 for greater than a recommended period of time." A1471:24-32. In its Final Written Decision, the

Board acknowledged that "verbal messages may correspond to messages displayed on the visual indicator, and that displayed messages are stored in the memory block." A16 (citing A1472:19-20; A1475:17). Owen discloses that the data stored in the data logging memory block may be transmitted to an external location. *See* A1475:9-10; A1492:24-31; A1505:16-18. But the Board erroneously concluded that these disclosures were insufficient because "Respironics has not shown that Owen discloses telling the patient *what* the recommended wear time is." A17 (emphasis added). Similarly, in denying Respironics's Request for Rehearing, the Board reiterated that "Owen does not disclose that it is *the patient* who is told what the recommended weartime is. . . . A patient cannot be said to have failed to comply with a recommendation absent evidence that the patient received the recommendation." A32. According to the Board, "[w]ithout evidence that that patient had been told not to wear the harness longer than a recommended period of time, information that the patient exceeded this time cannot be said to indicate whether the patient followed instructions for use." A17.

The Board's conclusion, however, is flawed because the term "patient compliance data," as originally construed by the Board, requires "data indicating *whether* a patient has followed instructions for use" (A8 (emphasis added)), not data indicating "*what* the recommended wear time is" (A17 (emphasis added)). The delivery of an instruction to a patient is not claimed—or even disclosed—in

26

the '003 patent.  By requiring Owen to explicitly disclose that *the patient was told* what the recommended wear time is, the Board has inappropriately imported a new limitation into the claim.  *Orion IP, LLC v. Hyundai Motor Am.*, 605 F.3d 967, 977 (Fed. Cir. 2010) (reversing a finding of no anticipation because an allegedly missing element from the prior art was not required by the claims); *Hewlett-Packard*, 340 F.3d at 1324 (affirming a finding of anticipation because "[w]e cannot construe the claim to add a limitation not present in the claim itself").

A claim does not automatically include every step or component that is necessary to practice its limitations—only those steps or components that are actually claimed.  In *SiRF Technology, Inc. v. International Trade Commission*, 601 F.3d 1319 (2010), for example, this Court considered whether certain GPS devices infringed claims directed to communicating and transmitting data. Analogizing the disputed claim language to a telephone call, the Court reasoned that

> if a claim for a method of making a telephone call included the limitation: "placing a telephone call to a telephone at a second location," the fact that the call must first be routed through a switched telephone network, and then eventually to the eventual recipient, would not prevent this claim limitation from being satisfied.

*Id.* at 1330.  The Court went on to hold that, even though the claimed steps of "'communicati[ng]' or 'transmitting' can only occur if the customer forwards the data to the end user and the end user downloads the data," the actions of

"'forwarding' or 'downloading' are not required by the claims," so the fact that the accused infringer did not perform the "forwarding" or "downloading" did not preclude a finding of direct infringement. *Id.* (alteration in original). In other words, because the steps of "forwarding" and "downloading" were not claimed, they were not claim limitations, even though they must necessarily be performed to practice the claim.

The same rule applies here. The disputed claims of the '003 patent are directed to systems and methods of monitoring medical information, including patient compliance data. But there is no requirement in the claims regarding the type of instruction given to the patient, when the instruction is given to the patient, or even that the patient received the instruction. In its decision denying rehearing, the Board concluded that "[a] patient cannot be said to have failed to comply with a recommendation absent evidence that the patient received the recommendation." A32. As an initial matter, a patient does not necessarily need to receive a recommendation in order to comply with a recommendation.[6] But even if the Board's assertion were correct, that does not mean that a patient receiving a recommendation is an element of the disputed claims, or even an element of "patient compliance data."

---

[6] For example, a driver can comply with a speed limit without actually being told what the speed limit is.

In any event, it is undisputed that Owen's device has the ability to determine whether the patient has worn the electrode harness for greater than a recommended period of time, such that it can issue a prompt indicating that the "patient has been wearing electrode harness 4 for *greater than a recommended period of time*." A1471:24-32 (emphasis added).  This disclosure is sufficient to meet the "patient compliance data" limitation as originally construed by the Board.  The word "recommended" establishes that a recommendation (or instruction) in fact exists.[7] The instruction is that the *patient* wear the electrode harness for a particular period of time (i.e., "a recommended period of time").  Moreover, the term "greater than" indicates that the patient has exceeded the recommended time.  Data related to Owen's wear-time message, therefore, indicates that the patient failed to comply with instructions for use.  Zoll's own expert, Dr. Gropper, acknowledged that wear-time data is a measure of patient compliance.  A2563.  Again, the patient's receipt of that recommendation—even if necessary to practice the claim—is not actually claimed.  Accordingly, Owen's wear-time prompt is "patient compliance data" under the Board's original and proper construction of that term.

---

[7] The Board did not reject Respironics's point that a "recommendation" is an instruction.  A32.  Rather, the Board's conclusion here is based upon the incorrect premise that because "[a] patient cannot be said to have failed to comply with a recommendation absent evidence that the patient received the recommendation." The patient receiving the recommendation, however, is not a claimed element. A32.

The Board's application of its original claim construction to Owen's wear-time indicator fails for another reason: even if the patient's receipt of the recommendation were a claimed element (which it is not), the wear-time message itself is an instruction given to a patient. That is, Owen necessarily instructs the patient on the recommended wear time when it alerts the patient that the recommended wear time has been exceeded. In requiring that an instruction be given to the patient at a specific time (i.e., before the wear-time indicator alerts the patient), the Board erroneously imported a new limitation.

In sum, because Owen's response button and wear-time indicator both provide "patient compliance data" under the proper construction of that term, the Board's determination that Owen does not anticipate the challenged claims of the '003 patent should be reversed. *Cf. Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1386 (Fed. Cir. 2009) ("Because we hold that under the proper construction . . . [the disputed claims] are anticipated as a matter of law, we reverse the district court's failure to grant JMOL on that issue.").

## C.    Owen Anticipates the '003 Patent Even Under the Board's Improperly Narrow Claim Construction

As discussed above, the Board imported several erroneous requirements into its original construction of "patient compliance data." But even under the Board's improperly narrow claim construction, its conclusion that Owen's response-button

disclosure does not anticipate the "patient compliance data" limitation is not supported by substantial evidence. *See In re Suitco Surface*, 603 F.3d at 1259-61.

>   **1.    Owen discloses recording and analyzing both the time at which a verbal prompt is given and the time at which the patient responds**

As acknowledged by Zoll and by the Board, Owen discloses that, "[i]n operation, the response button is pushed *in response to*, e.g., a 'PLEASE RESPOND' *verbal message* so as to confirm patient consciousness or lack thereof." A1473:13-15 (emphases added). The Board, however, determined that Owen does not disclose "patient compliance data" because Owen allegedly fails to disclose that "*the time at which the verbal prompt is given to the patient*" is recorded. *See* A16 (emphasis added); *see also* A33 ("Because Owen does not disclose recording, e.g., *the time at which the use was prompted,* the information that it does record about button pushes is *insufficient* to distinguish prompted pushes from unprompted or accidental ones." (emphases added)). According to the Board, without this context, there is no assurance that the button was pressed in response to an instruction. A16.

The Board's decision overlooks Owen's disclosure of how the monitored data is stored and transmitted by Owen's defibrillator. For example, Owen discloses that the "data logging memory block essentially stores *any information* provided to, or transmitted from, defibrillator 10 over a predetermined span of

time . . . .  This data is preferably stored in a log format and includes *time data specifying a time at which each event occurred*."  A1476:18-24 (emphases added). Information related to "voice, tone, and buzzer prompts," and "information concerning patient interaction with the defibrillator 10 (e.g., if and when the patient has pressed the response button)" are precisely two of the types of data stored in the data logging memory block.  A1475:17-19.  Simply put, Owen *does* disclose recording the time at which the verbal prompt is given to the patient.

Not only does Owen's defibrillator record the time at which verbal prompts and patient responses occur, it also expressly relies on the time elapsed between prompts and responses to determine whether delivery of a shock is appropriate:

> [I]n step S1205, master control module 90 outputs a message . . . such as "ARE YOU THERE".  This message is output both visually and audibly.  After the message is output, master control module 90 *waits a predetermined period of time for a response signal. This response signal may be input by the patient . . . by pressing the response button*. . . .  Since defibrillator 10 does not administer defibrillation energy to conscious patients, in this case, master control module 90 will not cause defibrillation energy to be transmitted to the patient.  Instead, processing proceeds to step S1203, in which [the] master control module simply issues instructions to the patient, which can vary depending upon the severity of the arrhythmia.

A1489:11-25 (emphasis added).  Since *each event* is stored in the data logging memory block along with data "specifying a time at which each event occurred" (A1476:18-24), an analysis of the data collected by Owen's defibrillator would

32

certainly provide sufficient information to determine the temporal relationship between the time the voice prompt was issued and the patient's response. Thus, contrary to the Board's conclusion, Owen provides sufficient context to determine, based on an analysis of the data related to the response button, whether the patient has followed instructions for use.

### 2. Owen discloses a training protocol that records how fast a patient is responding to verbal prompts

The Board also overlooks that, in the preferred embodiment, Owen's defibrillator trains the patient in the use of the response button via a response training protocol. A1490:28-30. The response training protocol serves to develop a habitual reaction in the patient to push the response button in response to voice and tactile simulation signal prompts during a potential rescue situation. A1491:8-11. Owen's training protocol also satisfies the Board's erroneous application of its original construction of "patient compliance data."

During the training protocol, the patient is regularly exposed to a "PLEASE RESPOND" first voice message prompt. A1491:1-22. If the patient does not respond to the first message, a second voice prompt and a tactile simulation signal prompt are delivered. *Id.*. That is, Owen's training protocol provides data specifically indicating whether the patient has followed a voice message prompt instruction. *Id.* Even more, Owen explicitly teaches that the defibrillator "record[s] *how fast* the patient is responding to the [training] prompts." A1491:19-

20. This data is stored in Owen's data logging memory block, which "stores any information provided to, or transmitted from" the defibrillator, preferably "in a log format and includes time data specifying a time at which each event occurred." A1476:18-24; *see also* A1475:9-32. Along with all information stored in the data logging memory block, data related to the training protocol can be transmitted to an external location. A1505:10-18. Thus, Owen's training protocol is an additional disclosure of "patient compliance data" that expressly includes a temporal context, thereby satisfying the Board's modified claim construction.

Because Owen clearly teaches—in at least two different contexts—recording both the time that an instruction is given and the time that the patient follows that instruction, the Board's ultimate finding of no anticipation is not supported by substantial evidence and should be reversed.

### D.    Owen Also Discloses the Remaining Elements of the Challenged Claims

Respironics established that Owen discloses all the remaining elements of the challenged claims. A808-20. But in its Final Written Decision, the Board continued to erroneously apply its original construction of "patient compliance data" to other claim elements. Specifically, the Board addressed Claims 4 and 19 of the '003 patent (and their dependent claims), which each include two means-plus-function terms that recite the "patient compliance data": the "means for monitoring and storing" and "means for exchanging." A19; A48 at 10:53-A49 at

11:7; A49 at 11:58-12:14.  The Board concluded that, because Respironics failed to show that Owen discloses "patient compliance data," it "follows that Respironics has failed also to show that Owen discloses structure that performs the recited functions involving 'patient compliance [and use] data.'"  A19 (alteration in original).  This was the Board's sole basis for finding claims 4 and 19 not unpatentable.

As discussed above, however, the Board's premise is wrong—Owen does in fact disclose "patient compliance data."  Moreover, Owen discloses all of the structure and function necessary to anticipate both the "means for monitoring and storing" and "means for exchanging" limitations.  A813-20.

Regarding the "monitoring and storing" term, the Board determined that the structures corresponding to each of these limitations are a medical device and a memory, and the function is "monitoring and storing operations information of the medical device and patient compliance and use data," as recited in the claim.  A8; A48 at 10:53–A49 at 11:7; A49 at 11:58-12:14.  It is undisputed that "Owen discloses a medical device (defibrillator 10) and a memory (data logging memory block 57)."  A19-20.  It is also undisputed that Owen's defibrillator monitors and stores various types of data, including patient parameters, and information related to the medical device.  *See, e.g.*, A1439 at Abstract; A1446:33-A1447:10; A1475:9-32; A1476:18-24; A1528:8-23.    And as discussed above, Owen's

defibrillator monitors and stores patient compliance data too. Therefore, the structures and function disclosed in Owen satisfy the means-plus-function limitation of "monitoring and storing."

As for the "means for exchanging" limitation, Respironics argued that the structure corresponding to this limitation is an "[i]nternal or external modem or a base station with a modem, or other data transfer technologies, and in the case of an implantable device, additionally including a transcutaneous transmitter."[8] A806 (citing to A37 at Abstract; A38-39 at Figs. 1, 2; A45 at 3:45-50; A46 at 5:9-13, 6:39-44; A47 at 8:10-17; A48 at 9:8-15; A47 at 8:22-24; A48 at 9:41-5). In its Institution Decision, the Board adopted Respironics's construction. A946-47. In its Final Written Decision, the Board did not address these limitations as it considered them immaterial to its analysis. *See* A9.

As Respironics showed in its Petition for *inter partes* review, however, Owen anticipates the "means for exchanging" limitation too. In particular, Owen

---

[8] The "means for exchanging" limitation reads "means for exchanging information between the medical device and the patient database, including means for transmitting the patient medical parameters, device performance data and patient compliance data to the patient database via the communications network." A49 at 12:8-12. The parties agreed that there are two clauses in this term: "means for exchanging" and "means for transmitting." A1061. The parties further agreed that the two clauses could be construed together, that the functions for each clause are recited in the claims, and that the same corresponding structure performs both functions. A1061.

discloses that its system includes a base station and an external interface over which information is exchanged with an external entity, like a doctor's office or a hospital. *See, e.g.*, A1445:23-28; 1446:4-14; 1447:20-24; A1504:1-6. The "means for exchanging" limitation recites "patient compliance data" as one of the types of data exchanged between the medical device and the patient database. A49 at 11:6-12:11. But as discussed above, Respironics has shown that Owen discloses "patient compliance data." Since the Board's finding of no anticipation is premised solely on Owen's alleged failure to disclose "patient compliance data," the Board's conclusion as to the remaining means-plus-function elements must also be reversed. At a minimum, this Court should remand this case to the Board with an instruction to reassess its analysis of Owen applying the correct claim construction of "patient compliance data."

## VI.   CONCLUSION

For these reasons, this Court should reverse the Board's decision that claims 2, 4, 5, 8, 9, 16, 19, and 20 are not anticipated by Owen. In the alternative, this Court should remand to the Board with instructions to reconsider Owen under the proper claim construction.

Date: May 26, 2015                    Respectfully submitted,

                                      /s/ Denise W. DeFranco
                                      Denise W. DeFranco
                                      FINNEGAN, HENDERSON, FARABOW,
                                        GARRETT & DUNNER, LLP
                                      Two Seaport Lane, 6th Floor
                                      Boston, MA  02210
                                      (617) 646-1600

                                      Jason L. Romrell
                                      Clara N. Jimenez
                                      FINNEGAN, HENDERSON, FARABOW,
                                        GARRETT & DUNNER, LLP
                                      901 New York Avenue, NW
                                      Washington, DC  20001-4413
                                      (202) 408-4000

                                      Attorneys for Appellant Respironics, Inc.

## CERTIFICATE OF SERVICE

I certify that on May 26, 2015, this Brief of Apellant Respironics, Inc., was filed electronically using the CM/ECF system and served via the CM/ECF system on counsel for Appellee as follows:

John C. Phillips
Dorothy P. Whelan
John A. Dragseth
Kurt L. Glitzenstein
Jennifer Huang
Fish & Richardson, P.C.
60 South Six Street
Minneapolis, MN  55402
Phillips@fr.com
Whelan@fr.com
Dragseth@fr.com
Glitzenstein@fr.com


/s/ Denise W. DeFranco

## CERTIFICATE OF COMPLIANCE

I certify that this Brief of Appellant Respironics, Inc., contains 8,518 words as measured by the word-processing software used to prepare this brief.


/s/ Denise W. DeFranco

**ADDENDUM**

Trials@uspto.gov                                    Paper 46
Tel: 571-272-7822                    Entered:  September 17, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

RESPIRONICS, INC.,
Petitioner,

v.

ZOLL MEDICAL CORPORATION,
Patent Owner.

_____

Case IPR2013-00322
Patent 6,681,003 B2

_____

Before BRYAN F. MOORE, BRIAN J. MCNAMARA, and
SCOTT E. KAMHOLZ, *Administrative Patent Judges.*

KAMHOLZ, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73(b)*

**A1**

IPR2013-00322
Patent 6,681,003 B2

## I.    INTRODUCTION

### A.  *Background*

Petitioner Respironics, Inc. ("Respironics") filed a Petition (Paper 1,
"Pet.") requesting an *inter partes* review of claims 1, 2, 4, 5, 8, 9, 16, 19, and
20 of U.S. Patent No. 6,681,003 B2 (Ex. 1001, "the '003 patent").  The
Board instituted trial for the challenged claims on the ground, asserted by
Respironics, of anticipation by WO 98/39061 (Ex. 1003, "Owen").  Decision
to Institute (Paper 9, "Dec.") 11.

After institution of trial, Patent Owner ZOLL Medical Corporation
("Zoll") filed a Patent Owner Response (Paper 14, "Resp.").  Respironics
filed a Reply (Paper 20, "Reply").

Zoll also filed a contingent Motion to Amend (Paper 15).  In its
Motion to Amend, Zoll proposed claim 36 to substitute for patent claim 1, if
claim 1 is determined to be unpatentable.  Motion to Amend 1-3.
Respironics filed an Opposition to the Motion to Amend (Paper 21, "Opp.").
Zoll filed a Reply to the Opposition (Paper 27, "Amend Reply").

Respironics filed a Motion to Exclude certain of Zoll's evidence
(Paper 31, "Pet. Motion to Exclude").  Zoll filed an Opposition (Paper 38),
and Respironics filed a Reply (Paper 39).

Respironics relies upon declarations of Dr. Igor Efimov in support of
its Petition (Ex. 1007), its Reply (Ex. 1011), and its Opposition to the
Motion to Amend (Ex. 1021).  Zoll relies upon declarations of Mr. Charles
M. Gropper in support of its Response (Ex. 2006), its Motion to Amend
(Ex. 2009), and its Reply to the Opposition to the Motion to Amend

IPR2013-00322
Patent 6,681,003 B2

(Ex. 2011).  Zoll also relies on deposition testimony of Dr. Efimov

(Ex. 2010).  Zoll filed a Motion for Observations on Cross-Examination of

Dr. Efimov (Paper 34, "Obs."), and Respironics filed a Response to the

Observations (Paper 37).

Oral argument was conducted on June 26, 2014.  A transcript is

entered as Paper 45 ("Tr.").

The Board has jurisdiction under 35 U.S.C. § 6(c).  This final written

decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Respironics has proved that claim 1 is unpatentable.  Respironics has

not proved that claims 2, 4, 5, 8, 9, 16, 19, and 20 are unpatentable.

Zoll's Motion to Amend is denied.

Respironics's Motion to Exclude Evidence is denied.

*B. The '003 Patent*

The '003 patent relates to a medical device worn by a patient and used

to provide therapy to the patient, as well as to collect and transmit

information about the patient, the device, and the patient's interaction with

the device, to a remote location.  Ex. 1001, Abstr.  Types of data collected

and transmitted include, e.g., patient medical information (*id*. at 3:1-4),

device performance data (*id.* at 4:28-32), and patient compliance data (*id*. at

4:35-43).  The device has a connection, such as a modem (*id.* at 3:45-50), to

a communications network, such as the Internet (*id.* at 3:50-51), over which

recorded data may be sent to a remote location (*id.* at 3:51-53) and

instructions or upgrade software may be received (*id.* at 6:55-58).

3

**A3**

IPR2013-00322
Patent 6,681,003 B2

Claims 2 and 4 are illustrative of the claimed subject matter and are reproduced below:

2. A method of monitoring patient medical information for the treatment of a patient, the method comprising the steps of:

providing a wearable medical device for treating the patient and monitoring patient medical information;

operatively connecting the medical device to the patient such that the medical device is worn by the patient;

recording the patient medical information, device performance data and patient compliance data in a storage means of the medical device;

operatively connecting the medical device to a communications system;

transmitting the patient medical information, device performance data and patient compliance data to a health care provider by means of said communications system and recording the patient medical information, device performance data and patient compliance data in an information database, wherein said transmitting step is performed while the medical device is operatively connected to the patient for providing treatment to the patient; and

providing access to the patient medical information, device performance data and patient compliance data to individuals.

4. A system for monitoring patient medical information and providing treatment to a patient, the system comprising:

a wearable medical device for monitoring and storing medical parameters and treating the patient in response to a monitored medical condition, the

4

IPR2013-00322
Patent 6,681,003 B2

medical device operatively attachable to the patient
such that the medical device is worn by the patient;
    a communications network;
    means for connecting the medical device to the
communication network;
    a patient database;
    means for monitoring and storing operations
information of the medical device and patient
compliance and use data;
    means for connecting the patient database to the
communication network; and
    means for exchanging information between the
medical device and the patient database, including
means for transmitting the medical device
operations information and the patient compliance
and use data to the patient database via the
communication network.

II.    DISCUSSION

*A. Claim Construction*

In an *inter partes* review, claim terms in an unexpired patent are
interpreted according to their broadest reasonable construction in light of the
specification of the patent in which they appear.  37 C.F.R. § 42.100(b);
Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14,
2012).  Claim terms are given their ordinary and customary meaning, as
would be understood by one of ordinary skill in the art in the context of the
entire disclosure.  *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed.
Cir. 2007).  Any special definition for a claim term must be set forth in the
specification with reasonable clarity, deliberateness, and precision.  *In re
Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

**A5**

IPR2013-00322
Patent 6,681,003 B2

A limitation using the term "means for" creates a rebuttable presumption that the drafter intended to invoke 35 U.S.C. § 112 ¶ 6.[1] *Personalized Media Commc'ns. LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 703-04 (Fed. Cir. 1998).  When construing a means-plus-function limitation under 35 U.S.C. § 112 ¶ 6, we first must identify the claimed function, and then we look to the specification to identify the corresponding structure that performs the claimed function.  *Medical Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1119 (Fed. Cir. 2002).  With respect to the second step, "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim."  *Golight, Inc. v. Wal-Mart Stores Inc.*, 355 F.3d 1327, 1334 (Fed. Cir. 2004) (citations and quotation marks omitted).

    1. *"patient compliance data" and "patient compliance and use data"*

Respironics argued, in its Petition, that "patient compliance data" and "patient compliance and use data" both should be construed as "data related to patient use."  Pet. 5 (citing Ex. 1007 ¶¶ 17-19).

Respironics's initial construction did not accord sufficient weight to the term "compliance."  Although Respironics and its expert, Dr. Efimov,

---

[1] Section 4(c) of the AIA re-designated 35 U.S.C. § 112 ¶ 6, as 35 U.S.C. § 112(f).  Because the '003 patent has a filing date before September 16, 2012 (effective date of the statute), we will refer to the pre-AIA version of 35 U.S.C. § 112.

IPR2013-00322
Patent 6,681,003 B2

cite numerous passages in the '003 patent, none of these passages serves to define "patient compliance [and use] data" in a manner that justifies disregarding that term.  Although the '003 patent does describe patient compliance data as relating to whether the patient is using the device improperly, or at all (Ex. 1001, 5:49-52), it is used within the context of assessing whether the patient is following (i.e., complying with) instructions. To construe the terms as encompassing any data related to patient use is, therefore, unreasonably broad.

We determined, for purposes of instituting *inter partes* review, that the broadest reasonable construction of "patient compliance [and use] data," in light of the Specification of the '003 patent, is "data indicating whether a patient has followed instructions for use."  Dec. 7 (citing Ex. 1001, 4:39-43). Respironics has since indicated that it does not contest this construction. Reply 1-2; Paper 44, 2; Tr. 6:4-5.

Zoll argues that "patient compliance data" should be construed as "data quantifying an extent to which a patient correctly follows instructions," based both on how the term would be understood by one of ordinary skill in the art, and also on how the term is used in the '003 patent. Resp. 3, 5-14.

We have considered Zoll's arguments and evidence but determine that neither the use of the term "patient compliance [and use] data" in the '003 patent, nor its understanding by one of ordinary skill in the art, justifies Zoll's argument that the broadest reasonable construction should be constrained to require that the data quantify the extent to which a patient correctly follows instructions.  In short, although Zoll shows that patient

IPR2013-00322
Patent 6,681,003 B2

compliance data *may* be quantitative, Zoll does not explain why patient compliance data *must* be quantitative.

For these reasons, we maintain our initial determination that the terms are properly construed to mean "data indicating whether a patient has followed instructions for use."

### 2. *Means-plus-function limitations*

Respironics argues that several limitations are to be construed as mean-plus-function limitations, in accordance with 35 U.S.C. § 112 ¶ 6, and proposes constructions for those terms. Pet. 7-11 (Table). We adopted Respironics's proposed constructions for purposes of instituting *inter partes* review. Dec. 8. Zoll does not contest the applicability of § 112 ¶ 6 to these limitations, and does not contest most of the proposed constructions.

We focus our analysis on the "means for monitoring and storing" limitation in claims 4 and 19. Claim 4 recites: "means for monitoring and storing operations information of the medical device and patient compliance and use data." Claim 19 recites: "means for monitoring and storing patient medical parameters, device performance data and patient compliance data." Respironics argues that the structures disclosed in the '003 patent as performing the "monitoring" and "storing" functions are a medical device and a memory. Pet. 8. Zoll does not contest this structural correspondence. We maintain our determination that these limitations invoke 35 U.S.C. § 112 ¶ 6, and that the structures corresponding to each of these limitations are a medical device and a memory.

8

**A8**

IPR2013-00322
Patent 6,681,003 B2

We have considered the parties' arguments and evidence concerning the other means-plus-function limitations, but we determine that express construction of these limitations is not material to this decision.

### 3. "Personnel"

Zoll proposes construing "personnel," in claim 16, as "the body of persons employed by or active in an organization, business, or service." Resp. 4. Respironics opposes this construction. Reply 8-9. We determine that express construction of this term is not material to this decision.

### B. Anticipation of Claims 1, 2, 4, 5, 8, 9, 16, 19, and 20 by Owen

We instituted review based on Respironics's contention that Owen anticipates claims 1, 2, 4, 5, 8, 9, 16, 19, and 20 under 35 U.S.C. § 102(b) (2010).

### 1. Overview of Owen

Owen discloses wearable defibrillator 10. Ex. 1003, Abstr. The defibrillator may be provided as a belt that can be worn around the waist or chest. *Id.* at 30:30-31.[2] The device includes electrodes that are used to monitor the patient and to deliver energy to the patient. *Id.* at 5:19-21. The device also includes a visual indicator that displays, e.g., statements indicating that the patient has been wearing the device "for greater than a recommended period of time." *Id.* at 31:24-32. The defibrillator also includes a response button, which the user can push in response to an

---

[2] All references to Owen use the page numbers as published, not the exhibit page numbers applied by Respironics.

9

IPR2013-00322
Patent 6,681,003 B2

instruction from the device to respond. *Id.* at 33:13-15. The defibrillator also may include another button, which the user can push in order to cause the defibrillator to record a cardiac event. *Id.* at 33:15-19. The response button may serve both purposes, so that a user may push it in response to an instruction, to trigger a recording, or both. *Id.* at 33:19-22.

The defibrillator includes data memory logging block 57 that stores all information provided to, or transmitted from, the defibrillator, including both operational and patient information. *Id.* at 35:9-10, 36:18-20. Patient information includes, e.g., the patient's electrocardiogram, messages displayed on the visual indicator, and "information concerning patient interaction with the defibrillator." *Id.* at 35:11–12, 17-18 (quotation). The interaction information concerns, "e.g., if and when the patient has pressed the response button." *Id.* at 35:18-19. The device also includes a base station that is connected to the defibrillator. *Id.* at 31:11-12. The base station includes an external interface over which information is exchanged with a remote location, such as a central repository or doctor's office. *Id.* at 64:2-5. The external interface may include a modem or a network connection. *Id.* at 65:14-15. The operational and patient information stored in data memory logging block 57 may be transmitted from the defibrillator to the central repository and stored there. *Id.* at 14:3-4, 65:10-18. Information stored in the central repository is available for analysis using, e.g., a computer in communication with the central repository. *Id.* at 14:6-9. Data may be received by the defibrillator from the remote location over the external interface, including instructions that reprogram the defibrillator. *Id.* at 68:17-18. The defibrillator also may transmit information to personal

10

**A10**

IPR2013-00322
Patent 6,681,003 B2

computer 6 or 201 while a patient wears the defibrillator.  *Id.* at 13:24-26, 31:18-21, 77:17-20, 79:9-11, Fig. 2.

> ### 2. *Analysis*

> #### a. *Claim 1*

Respironics presents arguments concerning anticipation of claim 1 by Owen on pages 11-13 of the Petition, supported by paragraphs 34-40 of Dr. Efimov's initial declaration (Ex. 1007).  Zoll directs no argument to claim 1 in its Response, or in subsequent papers.  Tr. 56:20–57:1.

Claim 1 recites:

> 1. A method of monitoring patient medical information for the treatment of a patient, the method comprising the steps of:
>
> providing a wearable medical device for monitoring patient medical information and treating the patient in response to a monitored medical condition;
>
> operatively connecting the medical device to the patient such that the medical device is worn by the patient;
>
> recording the patient medical information in a storage means of the medical device;
>
> operatively connecting the medical device to a communications system;
>
> transmitting the patient medical information to a health care provider by means of said communications system and recording the patient medical information in an information database; and
>
> providing access to the patient medical information to individuals.

11

**A11**

IPR2013-00322
Patent 6,681,003 B2

Respironics argues that Owen meets claim 1 because it discloses providing a wearable defibrillator to a patient that also monitors the patient's electrocardiogram, records the electrocardiogram in memory, connects to a communication system to send the recorded information over an external data link, stores the sent information in a central repository, and makes the stored data available to health care providers for review.  Pet. 12-13 (citing Ex. 1003, Abstr., 1:9-13, 4:31–5:2, 5:19-23, 5:23–6:14, 6:29–7:6, 7:11-19, 8:2-12, 14:2-12, 30:21-31, 31:8-21, 34:15-16, 35:9–36:20, 64:2-16, Figs. 1-2); Ex. 1007 ¶¶ 34-40.

Upon consideration of Respironics's arguments and evidence, we are persuaded that a preponderance of the evidence supports its contention that claim 1 is unpatentable under 35 U.S.C. § 102(b) as anticipated by Owen.  As summarized above in section II.B.1, Owen discloses a method in which a patient wears a device that can both monitor the patient and deliver defibrillation therapy while being worn.  Ex. 1003, 5:19-21.  The device stores recorded medical information, such as an electrocardiogram, in memory, and transmits that information over a communication network to a database for review by individuals.  *Id.* at 14:3-9, 35:9-10, 36:18-20.  This evidence demonstrates that all limitations of claim 1 were disclosed by Owen, in the claimed arrangement.  We determine, consequently, that Owen anticipates the subject matter of claim 1.

### b.  Claim 2

Respironics presents arguments concerning anticipation of claim 2 by Owen on pages 11-16 of the Petition, supported by paragraphs 34-39 and

41-49 of Dr. Efimov's initial declaration (Ex. 1007).  Claim 2 is reproduced above at page 4.

We focus our analysis on the claim limitation "patient compliance data."  Claim 2 requires that patient compliance data be recorded in a storage means of the medical device, transmitted to a health care provider, recorded in an information database, and made accessible to individuals.

In its Petition, Respironics cites a lengthy paragraph in Owen as providing disclosure of patient compliance data, as well as several other limitations.  Pet. 14 (claim chart) (citing Ex. 1003, 35:9–36:20).  This paragraph describes "data logging memory block 57" and lists many types of information that are stored in it.  Ex. 1003, 35:9–36:20.  Respironics quotes from this list several types of information, including "the patient's [electrocardiogram,]" "information concerning patient interaction with the defibrillator," "operational errors" of the defibrillator, and patient parameters, such as information indicating "whether the electrodes are not attached, or are improperly attached" to the patient.  Pet. 14.  Respironics does not identify in the Petition which of these types of information constitute patient compliance data, but Dr. Efimov cites information concerning electrode placement and "information concerning patient interaction with the defibrillator" when addressing patient compliance data.  Ex. 1007 ¶ 44, final sentence.  Respironics also cites "information relating to a plurality of patients that use the type of defibrillator" when discussing information that is recorded in an information database. Pet. 15 (claim chart) (citing Ex. 1003, 8:5-6).

IPR2013-00322
Patent 6,681,003 B2

Zoll argues that none of the types of information Respironics cites as being "patient compliance data" are so. Resp. 14-20. We address each type of information in turn.

### (1) "whether the electrodes are not attached, or are improperly attached"

Zoll argues that information indicating whether the electrodes are not attached or improperly attached is not "patient compliance data," because Owen does not disclose instructing the patient on the correct way to attach the electrodes, and also because improper attachment may simply reflect passive loosening, as opposed to the patient's failure to follow instructions. Resp. 18-20 (citing Ex. 2006 ¶ 40). We agree with Zoll. Respironics has not identified where Owen discloses instructing the patient on the correct placement of the electrodes. Respironics also has not explained how information indicating electrode detachment or incorrect attachment necessarily reflects the patient's failure to follow instructions, regardless of whether Owen discloses instructing the patient on electrode placement.

### (2) "information concerning patient interaction with the defibrillator"

In its Petition, Respironics does not specify what types of "information concerning patient interaction with the defibrillator" it considers to constitute "patient compliance data." In our decision instituting *inter partes* review, we cited disclosure in Owen that information logged in memory block 57 includes an indication of "if and when the patient has pressed the response button." Dec. 8 (citing Ex. 1003, 35:18-19). The patient may push the response button in response to the verbal message

14

**A14**

IPR2013-00322
Patent 6,681,003 B2

"PLEASE RESPOND" given by the defibrillator to the patient.  Ex. 1003, 33:13-15.  Respironics argues that the button-push information constitutes "patient compliance data."  Reply 10; Tr. 9:22–10:3.  Respironics also argues that a statement indicating that the patient has been wearing the electrode harness for "greater than a recommended period of time" constitutes "patient compliance data."  Reply 10-11 (citing Ex. 1003, 31:24-32).  According to Respironics, Owen discloses displaying this statement on the defibrillator's visual display, and "displayed messages" are among the types of information stored in, and transmitted from, memory block 57.  Reply 10 (citing Ex. 1003, 35:9-10).

*(a) Button push*

Zoll argues that the information indicating whether and when the patient pushed the response button is not "patient compliance data" as we construe that term, because nothing in Owen indicates whether the button push was in response to the verbal instruction "PLEASE RESPOND."  Resp. 15-17.  According to Zoll, Owen does not disclose storing any information concerning *when* a prompt to push the button was issued to the patient.  Tr. 52:7-11.  Without information about when a prompt was issued, argues Zoll, information about when the patient pushed the button does not provide any indication about whether the patient followed an instruction.  *Id.*

In reply, Respironics argues that when a patient pushes the button in response to the "PLEASE RESPOND" verbal instruction, the patient has followed an instruction, and the data indicating that the button was pushed is indicative of the patient's compliance with the instruction.  Reply 10.

15

**A15**

IPR2013-00322
Patent 6,681,003 B2

We agree with Zoll that information indicating whether and when the patient pushed the response button does not constitute "patient compliance data."  Although Owen discloses that verbal messages may correspond to messages displayed on the visual indicator (Ex. 1003, 32:19-20), and that displayed messages are stored in the memory block (*id.* at 35:17), Respironics does not identify disclosure that Owen records the time at which the verbal prompt is given to the patient.  Respironics thus has not explained how Owen provides sufficient context for one to be able to determine whether a prompt preceded a particular button push.  Without this context, the information recorded upon the pushing of the button is insufficient to distinguish a prompted button push from an unprompted button push or an accidental one.  There is no assurance that every, or indeed *any*, recorded button push was performed in response to an instruction.  Button-push information recorded in the memory block is not usable as patient compliance data, because there is no way to know that it indicates whether the patient followed instructions.  Because it cannot be known whether the button-push data reflects patient compliance, we determine that it does not constitute "patient compliance data."

*(b) "wear time" message*

In its Motion for Observations, Zoll cites testimony in which Dr. Efimov acknowledges that Owen does not disclose that the patient is told how long to wear the harness.  Obs. 12 (citing Ex. 2010, 116:6-21).  The testimony is as follows:

> Q.    . . . In rendering your opinions in this matter, you have not identified anything in Owen

16

IPR2013-00322
Patent 6,681,003 B2

> that would identify to the user, or to anyone, the actual wear time of the device, right?
>
> Ms. DeFRANCO: Objection. Scope and relevance.
>
> A.    I can look again. (Witness reviews document.) Yeah. I didn't find this particular clarification, but I did find other examples where it's more clarified, but not what exactly the amount of time patient will be instructed to wear the harness.

Ex. 2010, 116:8-21.  Respironics acknowledges that Owen does not disclose communicating the recommended wear time to the patient, other than by displaying the statement that the wear time has been exceeded. Tr. 22:18-23.

We are not persuaded that the "wear time" statement constitutes "patient compliance data," because Respironics has not shown that Owen discloses telling the patient what the recommended wear time is.  Without evidence that that patient had been told not to wear the harness longer than a recommended period of time, information that the patient exceeded this time cannot be said to indicate whether the patient followed instructions for use.

> *(3) "information relating to a plurality of patients*
> *that use the type of defibrillator"*

Respironics cites this type of information when addressing what information is recorded in the information database.  Pet. 15.  It is not clear whether Respironics is citing it as an example of "patient compliance data" or one of the other data types recited in the claim—patient medical information or device performance data.  Respironics does not make any

17

**A17**

IPR2013-00322
Patent 6,681,003 B2

plausible arguments, or cite any credible evidence, to explain how "information relating to a plurality of patients that use the type of defibrillator" constitutes "patient compliance data." We are not persuaded, consequently, that this type of information is "patient compliance data."

*(4) Analysis*

Anticipation is a question of fact and requires a showing of strict identity between the claimed subject matter and the disclosure of a single reference. *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1296 (Fed. Cir. 2002) (noting "strict identity required of the test for novelty"). To anticipate the subject matter of a claim, a single reference must disclose all limitations in the claimed arrangement. *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1361 (Fed. Cir. 2012). It is not enough to show that a reference is "substantially the same" as the claimed subject matter. *Jamesbury Corp. v. Litton Indus. Prods.*, 756 F.2d 1556, 1560 (Fed. Cir. 1985), *overruled on other grounds, A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020 (Fed. Cir. 1992) (*en banc*). Rather, it must be shown that the claim at issue encompasses subject matter fully disclosed by a single reference. *In re Skvorecz*, 580 F.3d 1262, 1266 (Fed. Cir. 2009).

Respironics has not shown that Owen discloses "patient compliance data," as we have construed that term—a construction that Respironics expressly does not contest. *See* Tr. 6:4-5; Paper 44, 2. We reach this conclusion because the evidence Respironics has put forward, as discussed above, does not persuade us that any of the data that Owen records or transmits is indicative of whether the patient has followed instructions for

18

IPR2013-00322
Patent 6,681,003 B2

use.  A preponderance of evidence does not emerge, consequently, to show that Owen discloses every limitation of claim 2 in the claimed arrangement. For these reasons, we determine that Respironics has not proved that Owen anticipates the subject matter of claim 2.

### c.  Claims 4, 5, 8, 9, 16, 19, and 20

Independent claims 4 and 19 are directed to systems for monitoring patient medical information and providing treatment to a patient.  Claim 4 recites the limitation "patient compliance and use data" within the "means for monitoring and storing" and "means for exchanging" limitations. Ex. 1001, 10:66-67, 11:6.  Claim 19 similarly recites "patient compliance data" as part of "means for monitoring and storing" and "means for exchanging" limitations.  As discussed above in section II.A.2, we construe the "means for monitoring and storing" limitations as invoking 35 U.S.C. § 112 ¶ 6 and as corresponding to a medical device and a memory.

As discussed above in section II.A.1, we construe "patient compliance and use data" identically to "patient compliance data," i.e., as "data indicating whether a patient has followed instructions for use."  Claim 19 and its dependent claim 20 recite "patient compliance data."

For reasons discussed above in connection to claim 2, we have determined that Respironics has failed to show that Owen discloses "patient compliance [and use] data."  It follows that Respironics has failed also to show that Owen discloses structure that performs the recited functions involving "patient compliance [and use] data."  Although it is undisputed that Owen discloses a medical device (defibrillator 10) and a memory (data

19

**A19**

IPR2013-00322
Patent 6,681,003 B2

logging memory block 57), Respironics has not shown that Owen discloses these structures in the context of performing any operations on "patient compliance [and use] data." Respironics has not shown, therefore, that Owen meets the means-plus-function limitations that recite functions involving "patient compliance [and use] data." *See Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1300 (Fed. Cir. 2009) (disclosure in the prior art of a particular structure, without discussion of that structure in the context of the claimed function, does not meet a means-plus-function limitation).

A preponderance of evidence does not emerge, consequently, to show that Owen discloses every limitation of claims 4 and 19 in the claimed arrangements. For these reasons, we determine that Respironics has not proved that Owen anticipates the subject matter of claims 4 and 19, as well as dependent claims 5, 8, 9, 16, and 20.

## III.    MOTION TO AMEND

### A.  *Zoll's Burden*

An *inter partes* review is neither a patent examination proceeding nor a patent reexamination proceeding. The proposed substitute claims, in a motion to amend, are not entered automatically and then subjected to examination. Rather, the substitute claims will be added directly to the patent, without examination, if the patent owner's motion to amend claims is granted. The patent owner is not rebutting a rejection in an Office Action, as though this proceeding were a patent examination or a patent reexamination. Instead, the patent owner bears the burden of proof in demonstrating

20

IPR2013-00322
Patent 6,681,003 B2

adequate written description support and patentability of the proposed

substitute claims over the prior art, and thus entitlement to add these

proposed substitute claims to its patent.  37 C.F.R. §§ 42.20(c); 42.121(b).

 B. *Proposed Claim*

Zoll proposes claim 36 as a substitute for claim 1.  Proposed claim 36

is reproduced below, with additions relative to claim 1 underlined and

deletions in brackets:

> 36. A method of monitoring patient medical information for the treatment of a patient, the method comprising the steps of:
>
> providing, at a remote location, a wearable medical device for monitoring and collecting information including patient medical information and data indicative of patient compliance, and treating the patient in response to a monitored medical condition;
>
> providing, at a central host location, a searchable information database that (i) stores patient medical information and data indicative of patient compliance for a plurality of different patients, and (ii) is internet-accessible simultaneously by a plurality of authorized individuals at different locations;
>
> at the remote location, operatively connecting the medical device to the patient such that the medical device is worn by the patient;
>
> at the remote location, recording the collected information that includes the patient medical information and the data indicative of patient compliance in a storage means of the medical device, wherein the data indicative of patient

21

compliance includes a quantitative measure of time that the medical device was worn by the patient;

at the remote location, operatively connecting the medical device to a communications system;

transmitting the collected information that includes the patient medical information and the data indicative of patient compliance from the remote location to the central host location accessible to a health care provider by means of said communications system and recording the patient medical information and the data indicative of patient compliance in [[an]] the searchable information database; [[and]]

at the central host location, providing simultaneous internet access to the patient medical information and the data indicative of patient compliance stored in the searchable information database to the plurality of authorized individuals at different locations remote from the central host location;

at the central host location, receiving medical device update data corresponding to a treatment adjustment specified by an authorized individual that, remotely and via the internet access, has reviewed information stored in the searchable information database that relates to the patient wearing the medical device; and

at the central host location, making the received medical device update data available for upload to the medical device at the remote location when the medical device next communicates with the central host location.

Motion to Amend 1-2.

IPR2013-00322
Patent 6,681,003 B2

C. *Written Description*

Zoll's entire discussion of the written description support for proposed

claim 36 in its Motion to Amend is reproduced below:

> Support for the amendment may be found in the
> '003 patent, whose disclosure matches the filed
> application (e.g., at 2:17-18, 2:24-30, 2:37-45,
> 2:58-62, 3:1-8, 3:50-53, 3:55-4:28, 4:32-63, 5:28-
> 59, 6:33-45, 6:62-7:4, 7:17-22, 8:10-15, 8:66-9:20,
> 9:33-35, 9:38-53, and Fig. 6. EX 1001) and in U.S.
> Provisional 60/157,881 (EX 1010) to which the
> '003 patent claims priority (e.g., 3:7-10, 3:13-16,
> 3:21-4:3, 4:11-14, 4:17-22, 6:4-6, 6:7-7:9, 7:12-19,
> 8:9-9:6, 10:9-16, 11:5-11, 11:19-22, 13:14-18,
> 15:4-17, and Fig. 6).

Motion to Amend 4. Zoll's expert, Mr. Gropper, does not address

written description support in his declaration that accompanies the Motion to

Amend. *See* Ex. 2009. Respironics argues, in opposition, that Zoll failed to

identify the written description support for proposed claim 36, both to the

level of detail required, and with regard to support for every limitation in the

provisional application of which Zoll claims the benefit. Opp. 1-2. Zoll

asserts, in reply, that the discussion of written description support in its

Motion to Amend was sufficient such that a person of ordinary skill would

have understood that the inventors had possession of the subject matter of

proposed claim 36. Amend Reply 2 (citing Ex. 2011 ¶ 23). Zoll also

submitted a more detailed listing of support for the limitations of proposed

claim 36 in the provisional application with Mr. Gropper's declaration that

IPR2013-00322
Patent 6,681,003 B2

accompanies Zoll's Reply in support of its Motion to Amend.  Ex. 2011 ¶ 23.

We agree with Respironics that Zoll has not made a sufficient showing of written description support for proposed claim 36 to demonstrate its entitlement to the proposed claim.  Zoll's string citations amount to little more than an invitation to us (and to Respironics, and to the public) to peruse the cited evidence and piece together a coherent argument for them.  This we will not do; it is the province of advocacy.  *See Stampa v. Jackson*, 78 USPQ2d 1567, 1571 (BPAI 2005) (quoting *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 111-12 (2d Cir. 1999) ("Appellant's Brief is at best an invitation to the court to scour the record, research any legal theory that comes to mind, and serve generally as an advocate for appellant. We decline the invitation.")).

This shortcoming in Zoll's motion is particularly acute because Zoll proposes extensive modifications relative to claim 1.  Zoll seeks to add hundreds of words to claim 1, more than tripling its length.  Yet Zoll offers only a string of citations to the '003 patent and to the underlying provisional application as evidence showing written description support.  So extensive a modification of the claim requires a more detailed showing of how each limitation of the proposed claim not only is disclosed in the original and benefit applications, but also is disclosed in combination with all of the other claim limitations.  *See Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1349 (Fed. Cir. 2013) (claim is considered as an "integrated whole" when assessing written description).

24

**A24**

IPR2013-00322
Patent 6,681,003 B2

Zoll's Reply in support of its Motion to Amend seeks to remedy the problem, but it is too little, too late.  A Reply affords the moving party an opportunity to refute arguments and evidence advanced by the opposing party, not an opportunity to improve its position.  37 C.F.R. § 42.23(b); Office Patent Trial Practice Guide, 77 Fed. Reg. at 48,767 ("[A] reply that raises a new issue or belatedly presents evidence will not be considered and may be returned. . . .  Examples . . . include new evidence necessary to make out a *prima facie* case for the patentability . . . of [a] . . . proposed substitute claim, and new evidence that could have been presented in a prior filing.").

The new evidence by Mr. Gropper is offered to bolster Zoll's motion, not to refute argument or evidence by Respironics that the claim lacks adequate written description support.  Zoll does not explain why it could not have presented Mr. Gropper's Reply evidence with its motion.[3]  Zoll has not shown why this late evidence should be considered.

But even if we set aside the procedural infirmities with Zoll's evidence, we do not find that the reply evidence is sufficient to meet Zoll's burden of proof.  Mr. Gropper opines that a person of ordinary skill in the art would have appreciated that the inventors had possession of the subject matter of claim 36, but he does not explain adequately the factual basis on which he reaches that conclusion.  At best, he provides a claim chart

---

[3] Nor is that evidence even properly presented in the Reply; instead, it is relegated to the declaration.  For example, the claim chart with citations to the provisional application is not reproduced in the Reply.  Zoll effectively seeks to circumvent the Reply page limit by doing this.

IPR2013-00322
Patent 6,681,003 B2

purporting to show disclosure of each limitation of proposed claim 36 in Zoll's provisional application. But he does not explain how each cited passage from the provisional application supports adequately the corresponding claim limitation, nor does Mr. Gropper explain how the cited passages from the provisional application, dispersed throughout the specification and figures, demonstrate possession of the claimed subject matter as an "integrated whole." *See Novozymes*, 723 F.3d at 1349.

We do not conclude that Zoll's proposed claim 36 lacks the support of adequate written description. Instead, we conclude that Zoll has not come forward with sufficient evidence to demonstrate that claim 36 has the required support. We do not reach the issue of whether Zoll has shown patentability over the prior art of proposed claim 36.

For these reasons, we deny Zoll's Motion to Amend.

## IV.    MOTION TO EXCLUDE EVIDENCE

Respironics seeks to exclude portions of the testimony Zoll elicited from Dr. Efimov during cross-examination on the basis of scope and relevance. Pet. Motion to Exclude 1. Respironics cites numerous passages from the transcript of Dr. Efimov's deposition in its motion. *Id.* at 1, 3 n.1, 4, 5, 6 nn.4-5. Some of these citations are marked "[b]y way of example," implying that they are not exhaustive lists of passages sought to be excluded. *See id.* at 6 nn.4-5.

We will not engage in guesswork, or scour the record, to determine what other evidence Respironics seeks to exclude in addition to the

IPR2013-00322
Patent 6,681,003 B2

"examples." Accordingly, we regard Respironics's motion as being directed against only those passages identified with pinpoint citations in the motion.

The only portion of Dr. Efimov's deposition testimony that we rely upon in reaching our final decision in the proceeding is page 116, lines 6-21. *See* section II.B.2.b(2)(b), *supra.* Respironics does not cite this portion, however, in its Motion to Exclude Evidence. Consequently, we do not construe Respironics's Motion to Exclude Evidence as being directed against this passage.

Respironics also makes blanket requests to exclude all evidence it objected to as irrelevant or exceeding scope. Pet. Motion to Exclude 6-7. As noted above, however, we are not going to scour the deposition transcript to locate every scope and relevance objection. Respironics *did* object timely to Dr. Efimov's testimony in the passage noted above. Ex. 2010, 116:13-14. But Respironics provides no discussion of this passage in its motion, or any credible explanation as to how or why it is irrelevant or exceeds scope. We are not going to evaluate the propriety of Respironics's objections in the absence of a particularized and detailed showing by Respironics to establish that the evidence is inadmissible. Such blanket requests rarely amount to a satisfactory showing that the moving party is entitled to the harsh remedy of exclusion. *See* 37 C.F.R. § 42.20(c).

For these reasons, we deny Respironics's Motion to Exclude Evidence.

IPR2013-00322
Patent 6,681,003 B2

V.    CONCLUSION

Respironics has proved, by a preponderance of the evidence, that claim 1 of the '003 patent is unpatentable as anticipated by Owen. Respironics has not proved that claims 2, 4, 5, 8, 9, 16, 19, and 20 are unpatentable as anticipated by Owen.  Zoll has not proved that proposed claim 36 is patentable.

VI.    ORDER

For the reasons given, it is

ORDERED that claim 1 of U.S. Patent No. 6,681,003 B2 is determined to be UNPATENTABLE;

FURTHER ORDERED that claims 2, 4, 5, 8, 9, 16, 19, and 20 of U.S. Patent No. 6,681,003 B2 are not determined to be unpatentable;

FURTHER ORDERED that Zoll's Motion to Amend is *denied*; and

FURTHER ORDERED that Respironics's Motion to Exclude Evidence is *denied*.

This is a final decision.  Parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2013-00322
Patent 6,681,003 B2


FOR PETITIONER:

Denise W. DeFranco
J. Michael Jakes
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, L.L.P.
denise.defranco@finnegan.com
mike.jakes@finnegan.com

FOR PATENT OWNER:

John C. Phillips
Dorothy P. Whelan
John A. Dragseth
Kurt Glitzenstein
Jennifer Huang
FISH & RICHARDSON P.C.
phillips@fr.com
whelan@fr.com
dragseth@fr.com
IPR14137-0008IP1@fr.com
jhuang@fr.com

29

**A29**

Trials@uspto.gov                                                      Paper 48
Tel: 571-272-7822                                      Entered: January 2, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

RESPIRONICS, INC.,
Petitioner,

v.

ZOLL MEDICAL CORPORATION,
Patent Owner.

_____

Case IPR2013-00322
Patent 6,681,003 B2

_____

Before BRYAN F. MOORE, BRIAN J. MCNAMARA, and
SCOTT E. KAMHOLZ, *Administrative Patent Judges.*

KAMHOLZ, *Administrative Patent Judge*.

DECISION
Petitioner's Request for Rehearing
*37 C.F.R. § 42.71*

IPR2013-00322
Patent 6,681,003 B2

## I.    INTRODUCTION

Petitioner Respironics, Inc. ("Respironics") filed a Request for
Rehearing (Paper 47, "Req.") of our determination in the Final Written
Decision (Paper 46, "Dec.") that Respironics had not proven the
unpatentability claims 2, 4, 5, 8, 9, 16, 19, and 20 of U.S. Patent No.
6,681,003 by a preponderance of the evidence.  Req. 1; Dec. 28.  We have
considered the Request for Rehearing but decline to modify the Decision.

## II.    STANDARD OF REVIEW

A party challenging a final written decision by way of a request for
rehearing must identify specifically all matters the party believes the Board
misapprehended or overlooked.  37 C.F.R. § 42.71(d).  The challenging
party bears the burden of showing that the decision should be modified.  *Id.*

## III.    DISCUSSION

Respironics challenges the Final Written Decision with respect to our
determination that Owen fails to disclose "patient compliance data."
Req. 1–12.  Respironics also challenges the Final Written Decision with
respect to the disposition of the means-plus-function claims.  *Id.* at 12–14.

### A.  *Wear-time statement*

Respironics argues that Owen's "statements indicating that the patient
has been wearing electrode harness 4 for greater than a recommended period
of time" (Ex. 1003, 31:31–32) is patient compliance data because it indicates
whether the patient has followed his physician's instructions to wear the
device for a recommended period of time.  Req. 4–5 (citing Paper 20, 10–11;

Ex. 1011 ¶ 65).  Respironics argues that the expert witness of Patent Owner ZOLL Medical Corporation ("Zoll") acknowledged that wear time data is a measure of patient compliance.  *Id.* at 5 (citing Paper 20, 10–11; Ex. 2006 ¶ 32).  Respironics argues that the word "recommended" indicates that it was the patient to whom the recommendation regarding wear time was given.  *Id.* at 6.

These arguments do not apprise us of error in the Final Written Decision.  As we explained, Owen does not disclose that it is *the patient* who is told what the recommended wear time is.  Dec. 17.  Respironics acknowledged as much.  *Id.* (citing Paper 45, 22:18–23).  Respironics does not identify where in its Petition or elsewhere in the record it identifies any disclosure in Owen to the contrary.  A patient cannot be said to have failed to comply with a recommendation absent evidence that the patient received the recommendation.  *Id.*  Respironcs did not show that Owen discloses making the recommendation to the patient.  *Id.*  It follows that Owen's statement that the patient exceeded this time cannot be deemed to indicate noncompliance.  *Id.*

Respironics's argument that the word "recommended" in Owen means "recommended to the patient" is improper because it is presented for the first time on Rehearing.  But the argument would be unpersuasive on the merits because it is unsupported by evidence of record.  Respironics identifies no credible evidence that Owen used, or that one of ordinary skill would have understood, the term "recommended" to mean "recommended to the patient."

3

**A32**

IPR2013-00322
Patent 6,681,003 B2

### B. *Response Button*

Respironics argues that Owen's data indicating that the response button was pushed is "patient compliance data," because in some circumstances the patient will have pushed the button after receiving an instruction to do so. Req. 8–9. Respironics argues that Owen thus anticipates in this mode of operation, even though in other circumstances button push data might not indicate compliance. *Id.* at 9–11.[*]

These arguments do not apprise us of error in the Final Written Decision. As we explained, Respironics did not show how the data Owen records provides sufficient context for one to be able to determine whether a prompt preceded a particular button push. Dec. 16. Respironics did not identify any credible disclosure in Owen indicating that its data record of a button push reflects whether the push was prompted. *Id.* Because Owen does not disclose recording, e.g., the time at which the user was prompted, the information that it does record about button pushes is insufficient to distinguish prompted pushes from unprompted or accidental ones. *Id.*

Respironics's reliance on cases concerning anticipation by disclosures with optional features is inapposite. Although Owen does disclose alternative embodiments with various button configurations, Respironics has

---

[*] Respironics also argues that Zoll's arguments on the "button push" issue should be disregarded because they were presented for the first time at oral argument. Req. 7–8 n.3. We disagree. Zoll presented this argument adequately in its Response. Dec. 15 (citing Resp. 15–17). Zoll's clarification of its position at oral argument was permissible.

4

**A33**

IPR2013-00322
Patent 6,681,003 B2

not identified any Owen embodiment in which the data Owen records is sufficient to indicate that a button push was prompted. *Id.*

### C. Means-plus-function claims

According to Respironics, Zoll does not dispute that Owen discloses the structures disclosed by the '003 patent as corresponding to the functions recited in means-plus-function limitations of claims 4 and 19. Req. 12–14.

This argument does not apprise us of error in the Final Written Decision. As we explained, a showing that a reference discloses a means-plus-function element requires showing that the reference discloses the corresponding structure in the context of performing the recited function. Dec. 20 (citing *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1300 (Fed. Cir. 2009). We determined that Owen does not disclose the corresponding structure in the context of the claimed function because it does not disclose operating the corresponding structure to perform the claimed functions on "patent compliance data" as that term is properly construed. *Id.* at 19–20.

### IV. CONCLUSION

For the reasons given, we determine that Respironics has not carried its burden of demonstrating that the Board misapprehended or overlooked any matters in rendering the Final Written Decision. We decline to modify the Final Written Decision.

IPR2013-00322
Patent 6,681,003 B2

V.     ORDER

Accordingly, it is

ORDERED that the Request for Rehearing is *denied*.

6

**A35**

IPR2013-00322
Patent 6,681,003 B2


FOR PETITIONER:

Denise W. DeFranco
J. Michael Jakes
Finnegan, Henderson, Farabow,
   Garrett & Dunner, L.L.P.

FOR PATENT OWNER:

John C. Phillips
Dorothy P. Whelan
John A. Dragseth
Fish & Richardson P.C.

US006681003B2

(12) **United States Patent**
Linder et al.

(10) Patent No.: **US 6,681,003 B2**
(45) Date of Patent: **Jan. 20, 2004**

(54) **DATA COLLECTION AND SYSTEM MANAGEMENT FOR PATIENT-WORN MEDICAL DEVICES**

(75) Inventors: **Marshal Linder**, Pittsbrugh, PA (US); **Thomas Kaib**, North Huntingdon, PA (US)

(73) Assignee: **Lifecor, Inc.**, Pittsburgh, PA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/197,159**

(22) Filed: **Jul. 16, 2002**

(65) **Prior Publication Data**

US 2002/0181680 A1 Dec. 5, 2002

**Related U.S. Application Data**

(63) Continuation of application No. 09/624,275, filed on Jul. 24, 2000.
(60) Provisional application No. 60/157,881, filed on Oct. 5, 1999.

(51) **Int. Cl.**[7] ............................................. H04M 11/00
(52) **U.S. Cl.** ................................................ 379/106.02
(58) **Field of Search** ...................... 379/106.02, 106.01, 379/38, 37, 39, 110.01, 90.01

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,531,527 A | 7/1985 | Reinhold, Jr. et al. |
| 4,838,275 A | 6/1989 | Lee |
| 5,036,852 A | 8/1991 | Leishman |
| 5,321,618 A | 6/1994 | Gessman |
| 5,367,555 A | 11/1994 | Isoyama |
| 5,390,238 A | 2/1995 | Kirk et al. |
| 5,544,661 A | 8/1996 | Davis et al. |
| 5,594,786 A | 1/1997 | Chaco et al. |
| 5,701,894 A | 12/1997 | Cherry et al. |
| 5,724,025 A | 3/1998 | Tavori |
| 5,730,143 A | 3/1998 | Schwarzberg |
| 5,741,306 A | 4/1998 | Glegyak et al. |
| 5,772,604 A | 6/1998 | Langberg et al. |
| 5,781,442 A | 7/1998 | Engleson et al. |
| 5,974,124 A * | 10/1999 | Schlueter et al. ...... 379/106.02 |
| 6,083,248 A * | 7/2000 | Thompson ................... 607/30 |
| 6,264,614 B1 | 7/2001 | Albert et al. |
| 6,402,691 B1 * | 6/2002 | Peddicord et al. ........... 379/38 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 707 825 A2 | 7/1995 |
| EP | 0 761 255 A1 | 8/1996 |
| WO | WO 97/22297 | 6/1997 |
| WO | WO 98/43537 | 10/1998 |
| WO | WO 99/59465 | 11/1999 |
| WO | WO 00/30529 | 6/2000 |

* cited by examiner

*Primary Examiner*—Stella Woo
(74) *Attorney, Agent, or Firm*—Buchanan Ingersoll, P.C.

(57) **ABSTRACT**

A method and system of monitoring information received from a patient-worn medical device is disclosed. A medical device, such as a portable or implantable device, collects patient and operational information, which information is transmitted to central location, such as a doctor's office or device manufacturer's location. The data collected can be analyzed to monitor both the patient health parameters as well as the operation of the device. Trend analysis can be performed in order for a physician to diagnose the patient's health and a medical device technician can insure correct functioning of the device itself. Communication between the central location and the medical device is preferably done through a modem connection, and software and other updates can be automatically transmitted to the medical device during data download from the device to the central location. Physicians and technicians can access the central location from any home or office computer via the internet.

**35 Claims, 6 Drawing Sheets**



Respironics, Inc.
Exhibit 1001



FIG. 1



FIG. 2

```
Lifecor Inc. Wearable Cardioverter Defibrillator
Device ID: 1008        Version:
*******************************************************

PATIENT FIRST NAME                        -------------------
PATIENT LAST NAME                         -------------------
PATIENT RESPONSE TEST (AWAKE)             25 SECONDS
PATIENT RESPONSE TEST (ASLEEP)            35 SECONDS
TIME PATIENT GOES TO SLEEP                00:00 HOURS
TIME PATIENT AWAKENS                      06:00 HOURS
POST TREATMENT PHONE NUMBER               1-800-LIFECOR
MODEM PREFIX (OPTIONAL)
DIALER MODE                               ROTARY
ARRHYTHMIA DETECTION THRESHOLD            150 BPM
PULSE ENERGY #1                           200 JOULES
PULSE ENERGY #2                           MAX. JOULES
PULSE ENERGY #3                           MAX. JOULES
PULSE ENERGY #4                           MAX. JOULES
PULSE ENERGY #5                           MAX. JOULES
< SET DEFAULTS >     < SAVE >    < EXIT >

Use <TAB> or <BACKSPACE> key to highlight option.
Use <ENTER> key to modify text value.
Use <UP ARROW> or <DOWN ARROW> key to change numeric value.
```

*FIG.3a*

Patient Address

| Add |    Rercord: 0 Patient: t4s10 xrb 106

| Patient ID | | Trial | ▽ |
|---|---|---|---|
| First Name | | M.I. | Last Name | |
| Birth Date | | SSN | Race | |
| Status | Active ▽ | Sex | ▽ | |
| Address | | | |
| Address2 | | | |
| Address3 | | | |
| City | | | |
| State | | Country | ▽ | Zip Code | |
| Home Phone | | Other Phone Number | | |
| Height(cm) | | Weight(kg) | | Chest(cm) | |
| WCD Garment Size | | WCD Garment Extension | | |

*FIG.3b*

Patient Adverse Event

| Add | Save | Record: 0 Patient: t4s10 xrb206 |

| First | Prev. | Next | Last |

| Name | | Center | |
|---|---|---|---|
| Date of the event | | | |
| Name of the event | | | |

Event description

| | ▲ |
| | ▼ |

| Was the event caused by WCD? | Unknown relationship ▽ |
|---|---|
| Was the event anticipated? | ⦿ Not Answered   ○ Yes   ○ No |
| Was the event serious? | ⦿ Not Answered   ○ Yes   ○ No |
| Was the event reported to LIFECOR? | ⦿ Not Answered   ○ Yes   ○ No |
| Was the event reported to IRB? | ⦿ Not Answered   ○ Yes   ○ No |
| Was the event reported to FDA? | ⦿ Not Answered   ○ Yes   ○ No |
| Person taking report at LIFECOR | |
| Date report to LIFECOR | |

*FIG. 4*

PATIENT ECG REPORT – T4S10 XRB 106

| EVENT DATE TIME | EVENT TYPE | TREATMENT | LENGTH |
|---|---|---|---|
| 07/14/1999 11:11:47 | AUTOMATIC | YES | 113 SECONDS |
| 07/14/1999 11:06:41 | BASELINE | N/A | 48 SECONDS |
| 07/14/1999 11:02:00 | AUTOMATIC | YES | 110 SECONDS |
| 07/14/1999 10:56:57 | BASELINE | N/A | 46 SECONDS |



*FIG. 5*



| Patient Weartime Summary | | Report Generated: Unknown | |
|---|---|---|---|
| – The patient wore the device 14 different days during the month. | | | |
| – The average daily weartime was 23 hours 31 minutes per day. | | | |
| – The cumulative weartime for the month was 329 hours 27 minutes. | | | |
| – The patient wore the device less than 22 hours on 1 days during the month. | | | |
| Details | | | |
| Day | Weartime for Day | Day | Weartime for Day |
| 1 | No wear data | 17 | No wear data |
| 2 | No wear data | 18 | No wear data |
| 3 | No wear data | 19 | No wear data |
| 4 | 8 hours 10 minutes | 20 | No wear data |
| 5 | 20 hours 18 minutes | 21 | No wear data |
| 6 | 22 hours 53 minutes | 22 | No wear data |
| 7 | 20 hours 30 minutes | 23 | No wear data |
| 8 | 19 hours 10 minutes | 24 | No wear data |

*FIG. 6*

A43

US 6,681,003 B2

1

# DATA COLLECTION AND SYSTEM MANAGEMENT FOR PATIENT-WORN MEDICAL DEVICES

## RELATED APPLICATION

This application is a continuation of patent application Ser. No. 09/624,275 filed on Jul. 24, 2000, which is based on and claims the benefit of our provisional patent application titled, "DATA COLLECTION AND SYSTEM MANAGE-MENT FOR PATIENT-WORN MEDICAL DEVICES" filed on Oct. 5, 1999 and assigned Serial No. 60/157,881.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The invention relates generally to patient-worn medical devices, and more particularly, this invention relates to the use of remote transmission and collection of data received from such a device and for the systems management of the device and its components.

### 2. Description of the Prior Art

Modern medical technology is available for allowing ambulatory patients to function in a normal day to day environment, even while requiring the monitoring of certain health and physical parameters. In addition to this, it is possible to have therapeutic devices or drugs automatically provided to the patient when in time of need. These medical devices are typically worn by the patients to provide the monitoring of a variety of conditions. These devices may also provide for the automatic treatment when the monitoring device detects that such treatment is required. Examples of such devices include a wearable cardioverter defibrillator, cardiac monitors and infusion pumps for the treatment of diabetes. With respect to the wearable cardioverter defibrillator (WCD), an example of such a device is disclosed in U.S. Pat. No. 5,741,306 which issued on Apr. 21, 1998 and its companion continuation-in-part application Ser. No. 09/054,714, filed on Apr. 13, 1998, which patent and application are assigned to the assignee herein and are hereby incorporated by reference in their entirety.

By way of brief explanation, this device provides a patient-worn energy delivery apparatus for imparting electrical therapy to the body of a patient responsive to an occurrence of a treatable condition. The apparatus includes a voltage converter for converting electrical energy from an initial voltage to a final voltage at a plurality of charging rates, and a defibrillator coupled between the converter and the patient so as to impart the electrical energy to the patient. The defibrillator produces preshaped electrical pulses such as defibrillation pulses and cardioversion pulses as determined by the monitoring of the patient. With electrodes appropriately placed on the patient, the device monitors the condition of the patient's heart on a continual basis to determine if the patient requires either a defibrillation pulse or a cardioversion pulse to restore normal heart function.

While the patient may be using any of these various medical devices, it is important that the data collected from the device be analyzed by the care giver. Typically, this means that the patient must travel to the hospital or clinic in order to exchange the device for a different one so that the data collected on that device can be read and analyzed or to at least drop off some sort of memory module, be it either a tape or a paper printout, so that the physician can analyze the data and thus the health of the patient. This necessitates that the patient again travel to the hospital in order to have this procedure done.

Moreover, these devices have traditionally required programming or configuration at the location which originally dispenses the device to the patient who, as stated above, must later return to that center for review of the collected data. When the components of the device need to be upgraded or changed due to expiration of their normal useful life, such as replacement of a battery or any other electronic component such as a solid state memory, the patient again must travel to the dispensing center in order to have this routine maintenance accomplished. Many times such an update to the system merely involves improving or upgrading the system's operating software so that the monitoring and therapy device works in a more efficient and helpful manner.

With digital technology, it is possible for such a device to be able to "download" the data via telephone line, for example, from the patient's home to a remote location. With this type of system, the patient data is collected into a solid state memory which can then be transmitted via telephone line and modem to the hospital or physician's office for analysis of the data by the physician.

It would be advantageous, therefore, if the frequency of the number of trips that the patient must make to the dispensing center, such as a hospital or physician's office, is minimized. Remote transmission of patient data and diagnostic information related to the operation of the device would help eliminate some of the heretofore repetitive trips that the patient must make. Moreover, remote upgrading of the operation of the device would more efficiently aid use of the most therapeutically effective device being available to the patient as quickly as possible.

It is therefore an object of the present invention to provide a medical device which can be worn by a patient and provides for interactive transfer of data and information from the device to a remote center, such as the doctor's office, for monitoring of the patient and of the equipment itself.

A further object of the present invention is to provide a device which can be upgraded remotely from the device dispensing center in order to reduce the number of personal visits by the patient to the dispensing center.

It is a still further object of the present invention to provide a patient-worn medical device which has the capability to transfer information and data with a remote center via telephone dial-in access, direct internet access or radio frequency communications.

## SUMMARY OF THE INVENTION

The above and objects are attached by the present invention, according to which, briefly stated, method of monitoring patient medical information, the method comprising the steps providing a wearable medical device for monitoring predetermined patient medical information. In one embodiment, the wearable medical device is a wearable cardiac defibrillator and monitor.

The wearable medical device is operatively connected to the patient and the predetermined patient medical information is recorded in a storage means of the wearable medical device. An outlet port of the wearable medical device is operatively connected to a communications system in order to transmit the predetermined patient medical information to a health care provider by means of the communications system, and the patient medical information recorded in an information database. Access to the patient medical information is provided to predetermined individuals, such as medical personnel for monitoring the patient's health and/or technical personnel for monitoring correct operation of the device.

US 6,681,003 B2

3

Where the wearable medical device is a cardiac defibrillation device, the step of recording the predetermined patient medical information comprises recording electrocardiograms of the patient's heart rhythm.

In a system for monitoring patient medical information, the system comprises a medical device operatively attached to a patient for monitoring and storing predetermined medical parameters. The medical device is connected to a communication network, which in turn is connected to the medical device thereby operably connected to exchange information with the patient database, and/or technical personnel for monitoring and upgrading the performance of the device.

## BRIEF DESCRIPTION OF THE DRAWING

Various other objects, features and advantages of the invention will become more apparent by reading the following detailed description in conjunction with the drawings, which are shown by way of example only, wherein:

FIG. 1 is an overall schematic diagram of the interconnected data transfer and remote access modules of the present invention;

FIG. 2 is a schematic representation of one embodiment of a means for connecting a wearable medical device with a communications network;

FIG. 3, consisting of FIGS. 3A and 3B, is a representation of computer screen for inputting patient data and various medical information;

FIG. 4 is a representation of a screen display indicating a patient adverse event as recorded by a wearable medical device.

FIG. 5 is a representation of a screen display showing an ECG report for a wearable cardiac defibrillator; and

FIG. 6 is a representation of a screen display for monitoring correct patient use of the wearable medical device.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring now to the drawings in detail, FIG. 1 shows an internet based data management architecture for the remote data collection and system management for patient-worn medical devices. The invention employs the use of data modems which employ a variety of transmission vehicles, such as wired telephones, radio frequency transmissions through dedicated or cellular networks or infrared transmission, for example, to provide for data collection and management of a patient-worn device. The internet or other data network is used to make this data available to physicians and their staff, making it possible to review the data from any location and manage the use of the device. Passwords, encryption and other security devices allow control of the data and to provide for patient privacy. In this manner, data need only be sent from the monitoring device to one location or the web server, which location can then be accessible by physicians or device technicians from any location to review the data collected to ensure both the health of the patient and the proper operation of the patient-worn device.

Preferably, the information for the operation of the device is collected at a central location, such as a performance analysis and post market surveillance operation which is maintained by the equipment manufacturer. Remote, dial-in access is available to this central location by both the patient, physician and device maintenance personnel. The patient

4

can download both the patient monitored data as well as operations data for the device to this central location which can be accessed by the physician and/or the maintenance personnel. In addition, the physician can access this data from anywhere by using a common Internet web browser to access the central location via the Internet. The physician can monitor the patient's health data which has been downloaded from the patient-worn device, for example, electrocardiogram (ECG) data. Additionally, since device performance data can be downloaded from the central location, the correct operation of the patient-worn device can be monitored to ensure that the physician is receiving and analyzing proper patient health information.

In this manner, a variety of data collection features can be provided. These include the automatic or manual transmission of sensor data, such as ECG signals from a holter monitor, for example, for collection of data in a database which is preferably a relational database for review and analysis over the course of the monitoring of the patient. In addition, the patient can be prompted for the manual transmission of data either on a predetermined basis or if the physician determines that a particular event has been detected where additional information is required. The use of dedicated modems or industry standard protocols such as TCP/IP allows the use of commercial networks for transmission, which networks can be protected from unauthorized review of information via passwords, encryption or other security devices. In addition, automatic or manual transmission of equipment performance data such as battery status, system faults or failures, capacity, treatment provided and sensor function can be presented to the central location for proper analysis. Automatic or manual transmission of results of analysis performed on the collected data, such as review of arrhythmia events, can then also be provided back to the patient or other physicians. If it is determined that a message is to be sent to the patient prompting him or her to perform certain functions in order to correct any nonconformities that a physician or maintenance personnel detects, automatic or manual transmission of patient compliance and use data can also be sent back to the central location for review by the physician or maintenance personnel to ensure that the patient has complied with whatever instructions either of these groups may have provided.

For example, if it is determined through review and analysis of ECG signals received from patient, that the garment has not been properly positioned such as through excessive "noise" in the ECG signals, a message can be sent to the patient advising him or her that the garment needs adjustment in order to insure proper placement of the electrodes. "Noise" can also be generated by physical characteristics of a particular patient such as body shape, how the electrodes are positioned, and body size. Also, by reference to FIG. 6, the average wear time data for which the patient has worn the device can be analyzed to determine patient compliance. In this way, it is a complete medical profile and information can be received from the patient for analysis by the physician and/or maintenance personal to insure the health of the patient as well as the correct operation of the device.

In the event that it is determined that the device is not operating properly, even though the patient is wearing it properly and for the prescribed period of time, the data can be analyzed and patient parameter changes, such as wear-time recommendations and placement of electrodes, can be implemented for the proper operation of the device for that particular patient. Through the on-line data collection system of the present invention, software upgrades can be

US 6,681,003 B2

5

transmitted directly to the patient's device during a data download for example, or the patient can be instructed to implement hardware upgrades during his or her next visit to the physician. Also, periodic battery replacement and charging instructions can be given to the patient to insure proper operation of the device. Data received from a multitude of patients can be analyzed to develop trends in device operation for future product improvements or enhancements.

In order to download the data, the patient-worn medical device, such as the WCD, can be connected to an external modem for telephonic connection to the central location. Alternatively, the device may include an internal modem and associated jack for connection to any standard phone line. The device can be programmed to include the appropriate telephone number of the central location. Once the device modem has been connected to the phone line, the patient need only initiate a data send function which can initiate the dialing and remote connection procedures. When connection is established between the patient-worn device and a web server at the central location, the data can be downloaded to that site for retrieval by the patient's physician and/or technical personnel for analysis of the data. Alternatively, direct internet access or radio frequency (RF) communication can be used to eliminate the need for, or in addition to, dial-in telephone access.

In addition to the collection and transmission of data related to the operation of the device and/or the patient's health, system management features are also provided. In this way the distribution of the collected data and any reports and analysis can be performed through the internet or the dedicated communications lines to remote computers used by the prescribing physicians or their staff. Thus, for example, if a physician requires either a second opinion or further review of specific data, that data can be retransmitted to another caregiver for the proper analysis and consultation between health care professionals. Analysis of equipment performance data may indicate the need for service or repair, which a database type gathering of information would allow maintenance personnel to observe trends and provide analysis for preventive service actions, not only of a particular monitoring device but any and all devices which may be in use in the field. Analysis of patient data and the results of any remote analysis allow the prescribing physician to adjust treatments or therapies, either through updating tile operation of the device by changing the software via the internet or by prescribing different medicines and notifying the patient that a different prescription is already waiting and available for him or her for delivery. Since the data is continually collected, the physician can analyze the compliance and use data to allow intervention by the prescribing physician if the device is not being used by the patient or is being used improperly.

In addition, the device parameters or software for the patient-worn medical device can be updated automatically when contact is made by the patient for the periodic data download to the central location. This update may be specific to the particular patient and occur at the direction of the prescribing physician after review of performance and patient data. This update may also be of the general update type which is applied to all devices in the field. The data collected from the patient may be used to preprogram replacement devices prior to being sent to particular patients, so that there is no need for the patient to return to the dispensing center, physician's office, hospital or pharmacy, etc. if service of the device is required. In the event that a device problem requires regulatory action or recall, these systems can be easily located since the continual analysis of

6

patient compliance and use data allows for automatic equipment tracking. These systems may be automatically located through the central data location and can be either updated, disabled remotely when contact is established or the patient can be notified that a recall is in effect and needs to return to the dispensing center as soon as possible. In addition to allowing action to be taken more quickly, the operational status of individual systems may be tracked. By continually monitoring the proper use of the devices, the dispensing center procedures can be continually updated for purposes such as billing and continual monitoring of the device to ensure that the physician's instructions are being fully complied with.

Since each of the parties (patients, physicians, maintenance personnel and equipment manufacturer) can access the data on an as needed basis, correct operation and use by the patient can be ensured. By continually monitoring patient's data, for example, if a physician determines that certain anomalies continue to occur in different monitors provided to different patients, the physician can check with maintenance personnel and those personnel can access the data to ensure that it is the equipment that may not be operating correctly and not that each patient is encountering the exact same medical condition simultaneously. This type of trend analysis is helpful in both providing proper patient care as well as providing a device which is most effective for monitoring and treating these patients. Thus the freedom that the patient enjoys by having a patient-worn device is increased by eliminating endless trips to and from the dispensing center to both check the health of the patient and for routine maintenance which again can be done from a remote location.

As shown in FIG. 1, the data collection and system management design of the present invention allows the various concerned persons to have access to the central location, such as a web server, for the exchange of data and information. The Internet serves as a "gateway" for enabling each of the parties to be linked across the information network. The modem, or other data transfer technology, used as part of the wearable medical device can dial into a central location, such as an Internet operated, for example, by the assignee of the present invention, by means of a communication server. Multiple party access to the host location by patients can be provided by a modem bank.

At the central location host, a searchable database, such as an SQL Database, can be provided to allow for performance analysis and post-market analysis of the overall operation of all of the patient-worn medical devices. For example, device technicians and engineers can search for error trends or other operational characteristics of the device to monitor proper operation of the medical devices. Alternatively, if any particular device has returned an error or other message to the central location, a technician can analyze the operation of that device and either recommend a course of action for the patient to correct the problem, transmit software instructions directly to the device to upgrade its operation, or instruct the patient to return the device to the distribution center for a properly operating machine. Broadcast messages may also be sent to all the devices for implementing these actions should a generic problem or fault be detected in the operation of the mechanism.

At the caregiver or doctor's office, the patient's physician can periodically review any particular patient's data by logging onto the central location, using a conventional web browser such as Netscape Navigator or Microsoft Internet Explorer. Once the appropriate password or other security procedures have been undertaken, the physician can down-

US 6,681,003 B2

7

load patient data for medical analysis, such as a periodic review of ECG data, or for specific review of a detected arrhythmia event or other machine implemented therapeutic action. After analysis of the patient medical data, the physician can prescribe remedial action for the patient in a variety of ways. This can be accomplished by means of electronic data transmission to the patient at the next scheduled data download, an instantaneous message to the patient indicating an immediate course of action, or even dispatching emergency personnel to the patient's home. The physician can also contact the central location host in the event that there is a concern with the proper operation of any of the devices. Even in those situations where the physician is not physically located at his or her office, by using a communication network such as the Internet the physician can obtain access to patient data, especially in an emergency situation, from virtually anywhere in the world. Another advantage to this remote access capability is that a physician can consult with a specialist, by either granting that person access to the data or retransmitting the data directly to the specialist over the Internet, such that all the parties can have access to the data simultaneously. Alternatively, a web-based conference can be conducted by persons located at various locations by each of the parties accessing the same secure website to analyze the data.

In order to prepare a wearable cardiac defibrillator monitor (WCD) to transmit information over the internet or other communications network, it must first be programmed to include the specific patient information. The WCD in order to perform this initial program, the following steps are performed:

The WCD must first be connected to a personal computer (PC) in order to program the initial patient information. This is done by use of a computer cable which connects the monitor to a serial port for example of the PC. This is shown in FIG. 2. A program is initiated on the PC which will then program the information into the computer memory of the defibrillator monitor. When setting up a new patient, the current time and date are entered into the WCD monitor. When configuring the monitor for a new patient, a "set-up new patient" operation is performed. The monitor is programmed with the patient's full name, which can then be used when transmitting data to identify the patient directly. When the patient information is entered, the particular patient settings for that patient are then input into the monitor's memory. As shown in FIG. 3, there are numerous data points that must be inputted. On-screen instructions inform the service provider as to how to modify the particular patient data. Some of these parameters may include whether or not a modem prefix is required to dial from a patient's residence or whether the phone is digital (tone) or rotary (pulse).

After these initial patient parameters are installed, the patient baseline ECG data is inputted into the monitor.

The monitor must first be disconnected from the PC by disconnecting the computer cable from the monitor. The patient is at this time wearing the monitor such that the electrodes are placed on the appropriate spots on the patients body. The monitor is then activated to record patient's baseline ECG which will be displayed on the monitor. Generally, the monitor will record the patients heart rhythm for a period of from 45 seconds to 5 minutes to initialize, as the monitor device learns the patient's baseline. Once the monitor has performed this function a message is displayed which states that the baseline recording is complete and that the monitor can begin normal functioning. In the event that the patient has a rhythm that is difficult to learn, the monitor

8

provides a message such as "baseline failed" and patient baseline recording can begin again. In the event that the electrodes are not properly placed on the patient's body, a message is displayed which informs the user to properly position the electrode belt for the wearable defibrillator.

Once the patient's baseline information has been recorded, this information must then be sent to the device manufacturer's database server via the modem.

The WCD system also includes a modem cable for connecting the monitor to an external modem. Alternatively, an internal modem may be provided in the monitor. The appropriate phone lines are connected and the modem is connected to the phone line and/or a common household telephone jack. When the telephone connections have been made, the modem is connected to the power supply and turned on to begin the information transfer. Preferably, the patient's database resides on the Lifecor's internet database server to receive the various patient information. When the modem and monitor are properly connected a message is displayed to indicate that it is permissible to now send data. The patient can then initiate data transfer by pressing the appropriate button on the monitor such that the modem begins dialing into the data center's database server. During data transfer, a message is displayed that such data transfer is in progress. When transfer is complete, the appropriate message is displayed indicating that the data transfer is complete and that modem should now be disconnected. In the event of any problem with the data transfer, a message is displayed and a further attempt to transmit data should be performed. Upon successful transfer of data the monitor is disconnected from the modem.

Once the patient information has been baselined and the monitor information has been sent via modem to the Lifecor database server or other communications network data center, the internet can then be used to enter and/or review patient data. When entering this website, a user is prompted to enter their login name and password in order to enter the "WCDNET". Upon successfully entering the website, a patient list is displayed to the user such that patient information can be accessed in several ways. Patients can either be accessed directly by patient name or by an identified category such as patient identification, last name, first name or serial number of the device, and a search function performed. For example, if the patient's name begins with the letter R, this can be inputted into the appropriate area on the patient's record and a search done for all patient's who last name begin with the letter R. Once the desired patient is selected, the patient screen is displayed. This allows the user to enter more patient information such as address, phone number, height, weight, chest circumference, and garment and extension size for the WCD monitor belt. Once this information is inputted, it is saved within the communications network data center or database server. Next, appropriate patient demographic and medical information can be inputted. A typical screen display for inputting various patient information is shown in FIG. 3. Once the entire patient initial information is inputted, this data is saved to be compared against later downloads of information from that patient.

Should an "adverse event" occur, such a screen is also provided for the health care provider to input the pertinent information, as shown in FIG. 4. These include the date of the adverse event, nature or description of the event, and other event information.

In order to view the patient's electrocardiogram (ECG) recordings, the "ECG report screen" as shown in FIG. 5 is

9      10

accessed. The ECG recording are listed by date, time, type, treatment (if applicable) and length.

To see the patient's compliance record, the "compliance screen" as shown in FIG. 6 is accessed. This shows for example, how many hours out of each day the patient has 5 actually been wearing the monitor such that data is being inputted into the system.

In order to provide the patient information into the Lifecor's internet site database, the patient is prompted periodically, such as in the order of every 7 days, to connect 10 his/her monitor to the modem for transfer of information to the database. The message is displayed indicating that it is time to connect to the modem to transfer the data to the database server. This communication is performed as set forth above. 15

The monitor records electrocardiogram data which is to be sent to the monitoring service. The patient is thus prompted to transfer this data to the physician so that active monitoring of the patient by a health care provider can be performed. 20

During such data transfers there are to be updates to the patient's monitoring device, which will be readily apparent with the patient's device serial number or other identifying data is also transmitted with that patient's data, additional 25 instructions can be sent from the Lifecor's web site to the patient's monitor. This may include, for example, software updates for the monitor, as well as alerting the patient to product recalls, if necessary, instructing the patient to return the monitor to the health care service provider for additional 30 onsite maintenance and upgrading of the hardware of the device.

For an implantable device, a transcutaneous transmitter is used to communicate with the implanted medical device; such as a pacemaker. Operating parameters can be updated, 35 such as these previously described above according to the unique operating characteristics of the implanted device within a particular patient. As the patient's medical information is analyzed from time to time by a physician, these operating parameters can be adjusted in order to more fully 40 serve the patient's medical needs. For a pacemaker, for example, the transcutaneous transmitter can be placed over the area on the patient's body where the device is implanted, and radio frequency (RF) communications between the pacemaker and the transmitter can be established. The 45 transmitter is in turn operatively associated with global communication network, such as with a base station having a modem and other communication hardware as is well known in the art.

Additionally, the wearable device may also communicate 50 with the network via a base station. Rather than having to remove the wearable device or directly plug it into the communication device, and RF or infrared communication link can be used. In this way, should the device detect an emergency situation, especially when the patient is asleep or 55 unconscious, the device can automatically establish a communication link with the physicians office, for example, or call emergency personnel directly to the patient's location.

Therefore, the present invention provides distinct and unique advantages for the patient-worn medical devices by 60 integrating data collection and system management functions into a central location for the proper operation of these devices. And while specific embodiments of practicing the invention have been described in detail, it will be appreciated by those skilled in the art that various modifications and 65 alternatives to those details could be developed in light of the overall teaching of the disclosure. Accordingly, the

particular arrangements disclosed are meant to be illustrative only and not limiting to the scope of the invention which is to be given the full breadth of the foregoing description and appended claims and any and all equivalents

We claim:

1. A method of monitoring patient medical information for the treatment of a patient, the method comprising the steps of:

providing a wearable medical device for monitoring patient medical information and treating the patient in response to a monitored medical condition;

operatively connecting the medical device to the patient such that the medical device is worn by the patient;

recording the patient medical information in a storage means of the medical device;

operatively connecting the medical device to a communications system;

transmitting the patient medical information to a health care provider by means of said communications system and recording the patient medical information in an information database; and

providing access to the patient medical information to individuals.

2. A method of monitoring patient medical information for the treatment of a patient, the method comprising the steps of:

providing a wearable medical device for treating the patient and monitoring patient medical information;

operatively connecting the medical device to the patient such that the medical device is worn by the patient;

recording the patient medical information, device performance data and patient compliance data in a storage means of the medical device;

operatively connecting the medical device to a communications system;

transmitting the patient medical information, device performance data and patient compliance data to a health care provider by means of said communications system and recording the patient medical information, device performance data and patient compliance data in an information database, wherein said transmitting step is performed while the medical device is operatively connected to the patient for providing treatment to the patient; and

providing access to the patient medical information, device performance data and patient compliance data to individuals.

3. The method as set forth in claim 2, wherein the medical device is a cardiac defibrillation device and the step of recording the patient medical information comprises recording electrocardiograms of the patient's heart rhythm.

4. A system for monitoring patient medical information and providing treatment to a patient, the system comprising:

a wearable medical device for monitoring and storing medical parameters and treating the patient in response to a monitored medical condition, the medical device operatively attachable to the patient such that the medical device is worn by the patient;

a communications network;

means for connecting the medical device to the communication network;

a patient database;

means for monitoring and storing operations information of the medical device and patient compliance and use data;

means for connecting the patient database to the communication network; and

means for exchanging information between the medical device and the patient database, including means for transmitting the medical device operations information and the patient compliance and use data to the patient database via the communication network.

**5.** The system as recited in claim **4,** further comprising means for monitoring an operating status of the medical device.

**6.** The system as recited in claim **5** wherein the medical device is a cardiac defibrillator and said medical parameters include at least partial electro-cardiogram (ECG) data.

**7.** The system as recited in claim **4,** wherein the medical device is a wearable cardio-defibrillator.

**8.** The system as recited in claim **4,** wherein said means for exchanging information includes means for transmitting patient medical information from the medical device to the patient database.

**9.** The system as recited in claim **4,** wherein said means for monitoring operations information includes means for monitoring battery status for a battery of the medical device.

**10.** The system as recited in claim **6,** further comprising means for storing operating status information of the cardiac defibrillator and wherein said means for exchanging information includes means for transmitting operating status information to the patient database via the communication network.

**11.** The system as recited in claim **10** wherein said means for monitoring operating status information includes means for monitoring battery status for a battery of the medical device.

**12.** The system as recited in claim **11** wherein said means for monitoring operating status information further includes means for transmitting the operating status information to the patient database.

**13.** The system as recited in claim **12,** wherein said operating status information includes one or more of battery capacity, system memory, patient device utilization and system noise.

**14.** The system as recited in claim **13,** further including means for analyzing said operating status information.

**15.** The system as recited in claim **14,** further including means for transmitting parameter update information to the medical device based on said analysis of the operating status information.

**16.** The system as recited in claim **8,** further including means for accessing the patient database via the communication network, wherein medical personnel can analyze the patient medical information from a remote location.

**17.** The system as recited in claim **10,** further including means for accessing the patient database via the communication network, such that technical personnel can analyze said operating status information.

**18.** The system as recited in claim **17,** wherein said operating status information includes one or more of patient wear data for the cardiac defibrillator, alarm indicators, and ECG signal information.

**19.** A system for monitoring patient medical information and providing treatment to a patient, the system comprising:

a wearable medical device for monitoring and storing medical parameters and treating the patient in response to a monitored medical condition, the medical device operatively attachable to the patient such that the medical device is worn by the patient;

a communications network;

means for connecting the medical device to the communication network;

a patient database;

means for connecting the patient database to the communication network;

means for monitoring and storing patient medical parameters, device performance data and patient compliance data;

means for exchanging information between the medical device and the patient database, including means for transmitting the patient medical parameters, device performance data and patient compliance data to the patient database via the communication network; and

means for downloading device parameter software to the medical device from the communications network.

**20.** The system as recited in claim **19,** wherein the device parameter software includes one or more of operations upgrade software, patient compliance guidelines or product maintenance information.

**21.** A system for monitoring patient medical information and providing treatment to a patient, the system comprising:

a wearable cardiac defibrillator for collecting and storing electro-cardiogram (ECG) data and treating the patient in response to the collected ECG data, the cardiac defibrillator operatively attachable to the patient such that the cardiac defibrillator is worn by the patient;

a communication network;

means for connecting the cardiac defibrillator to the communication network;

a patient database;

means for connecting the patient database to the communication network;

means for monitoring and storing patient medical parameters, device performance data and patient compliance data;

means for exchanging information between the cardiac defibrillator and the patient database, including means for transmitting the patient medical parameters, device performance data and patient compliance data to the patient database via the communications network, and means for transmitting instructions on proper use and operation of the cardiac defibrillator to the patient via the communications network; and

means for downloading software to the cardiac defibrillator from the communications network.

**22.** A system for monitoring patient medical information and providing treatment to a patient, the system comprising:

a wearable cardiac defibrillator for collecting and storing electro-cardiogram (ECG) data and treating the patient in response to the collected ECG data, the cardiac defibrillator operatively attachable to the patient such that the cardiac defibrillator is worn by the patient;

a communications network;

means for connecting the cardiac defibrillator to the communication network;

a patient database;

means for connecting the patient database to the communication network;

means for exchanging information between the cardiac defibrillator and the patient database; and

means for downloading instructions for proper operation of the cardiac defibrillator to a patient wearing the cardiac defibrillator via the communications network.

**23.** The system as recited in claim **22,** wherein said means for connecting the cardiac defibrillator to the communications network comprises a base station having a modem for

US 6,681,003 B2

13

14

accessing the communications network and a transcutaneous informational transmission device operably associated with the base station for communication with the cardiac defibrillator.

24. The system as recited in claim 22, further comprising means for monitoring an operating status of the cardiac defibrillator.

25. The system as recited in claim 22, wherein said means for exchanging information includes means for transmitting patient medical information from the cardiac defibrillator to the patient database.

26. The system as recited in claim 22, wherein said means for monitoring operations information includes means for monitoring battery status for a battery of the cardiac defibrillator.

27. The system as recited in claim 24, further comprising means for storing operating status information of the cardiac defibrillator and wherein said means for exchanging information includes means for transmitting operating status information to the patient database via the communication network.

28. The system as recited in claim 27 wherein said means for monitoring operating status information includes means for monitoring battery status for a battery of the cardiac defibrillator.

29. The system as recited in claim 28 wherein said means for monitoring operating status information further includes means for transmitting the operating status information to the patient database.

30. The system as recited in claim 29 wherein said operating status information includes one or more of battery capacity, system memory, patient device utilization and system noise.

31. The system as recited in claim 30, further including means for analyzing said operating status information.

32. The system as recited in claim 31, further including means for transmitting parameter update information to the cardiac defibrillator based on said analysis of the operating status information.

33. The system as recited in claim 25, further including means for accessing the patient database via the communication network, wherein medical personnel can analyze the patient medical information from a remote location.

34. The system as recited in claim 27, further including means for accessing the patient database via the communication network, such that technical personnel can analyze said operating status information.

35. The system as recited in claim 34, wherein said operating status information includes one or more of patient wear data for the cardiac defibrillator, alarm indicators, and ECG signal information.

* * * * *